[No. C068485. Third Dist. Apr. 24, 2012.]

Adoption of H.R., a Minor.
L.R., Plaintiff and Respondent, v.
A.L., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III and IV.

■■■■■■

COUNSEL

Darlene Azevedo Kelly for Defendant and Appellant.

Law Office of Bunmi Awoniyi, Bunmi Awoniyi; Weintraub Genshlea Chediak Tobin & Tobin and Brendan J. Begley for Plaintiff and Respondent.

OPINION

**DUARTE, J.**—Father A.L. (father) appeals from a judgment terminating his parental rights to his daughter H.R. (minor).

Long before minor was born, father had sought to establish his parental rights. Mother K.G. (mother) offered minor for adoption at birth without father's consent. The trial court found father to be a *Kelsey S.* father,[1] yet terminated his parental rights after hearing, finding detriment and best

---

[1] *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*). As we discuss at length, *post*, under *Kelsey S.*, a court cannot terminate the parental rights of an unwed father who promptly comes forward and demonstrates a full commitment to his parental responsibilities absent a showing of unfitness as a parent. (*Kelsey S., supra*, 1 Cal.4th at p. 849.)

interests of minor. The court made no findings of unfitness specific to the applicable provisions of the Family Code.

On appeal, father contends the trial court applied the incorrect standard and thus failed to make the determination of unfitness required to properly terminate his parental rights. Respondent prospective adoptive mother (L.R.) does not dispute that there was error, but counters that any error was invited. She argues that substantial evidence supported termination even applying the proper standard, thus any error was harmless. She asserts that regardless of father's claims, the trial court was correct in its decision to terminate his parental rights because he was not properly classified a *Kelsey S.* father.

As we explain in the unpublished portion of our opinion, there was error, and it was neither invited nor harmless. We shall reverse the judgment terminating father's parental rights and remand for determination of custody and visitation. Pursuant to Code of Civil Procedure section 906, we first review the issue of whether father was properly classified as a *Kelsey S.* father and conclude that he was, affirming the trial court's finding in that regard in the published portion of our opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### Minor's Parents and Birth

Father and mother met while working at Vic's Market in Sacramento. They began seeing each other in February 2009; by May, mother was pregnant. In late May, they rented a two-bedroom apartment in the complex where father had been living. Less than a month after moving in, mother went to the manager and turned in her keys. She told the manager that she feared for her life because father was "verbally and aggressively abusive."

The relationship between father and mother was rocky; they had constant fights, some involving physical abuse. Father criticized and insulted mother and called her demeaning names. Still, they continued to spend "some nights" together—estimates of nights spent together ranged from 40 to 90 percent. Father wanted to get married; in August, the two put a downpayment on wedding rings. In September, mother withdrew the money and closed the account.

Both parents lost their jobs at Vic's. Mother went to school to become a phlebotomist. Father collected unemployment and took odd jobs. He was eventually hired as a meatcutter at another market. Mother received WIC

Program (the special supplemental nutrition program for women, infants, and children) benefits and MediCal paid her pregnancy expenses. Father received food stamps.

Near the end of the relationship, in approximately late August to late September 2009, the two were together one night and argued, "screaming and yelling." Mother's teenage daughter got involved, and mother told father to leave, but he refused. Father left when mother called the police.

The relationship ended shortly thereafter. Mother told father to leave her prenatal care appointment; she changed the paperwork so that he received no further medical information about the pregnancy. Father was not notified when minor was born; he had to call many hospitals to get information about the birth.

After mother stopped seeing father, she contacted an agency and selected adoptive parents, L.R. and K.R. Mother knew that father would not consent to the adoption and she disclosed this fact to the agency and the adoptive parents.

Minor was born in January of 2010. At birth, she weighed only 5.5 pounds, was jaundiced, and had trouble breathing.[2] She spent five days in the intensive care unit and then went home with L.R. and K.R.

### Paternity and Adoption Petitions

On October 26, 2009, shortly after he was told to leave the doctor's office, father petitioned the Sacramento County Superior Court to establish a parental relationship. He sought a DNA test to establish his paternity; it was ordered at his expense.

Two days later, mother filed for a temporary restraining order and sought a permanent domestic violence restraining order. Mother noted abuse from May 2009 to the present, claiming "only one incident of physical abuse" but other verbal harassment and an intent by father to "take" her "unborn" child. In December, the trial court denied the request for the restraining order, citing insufficient evidence and disbelieving mother's testimony.[3] The temporary restraining orders previously issued were dismissed.

---

[2] Seven months later, minor was "very healthy" and weighed almost 17 pounds. L.R. testified minor had special needs. She did not explain the nature of these special needs and we see no evidence of special needs in the record.

[3] At trial on the petition to terminate father's parental rights, the court found it unclear whose veracity the domestic violence court doubted, noting it was inconclusive who the respondent was in the domestic violence case. The minute order denying the restraining order shows a case title of *A.L. v. K.G.*, meaning mother was the respondent. The domestic violence

On January 8, 2010, L.R. and K.R. filed a request to adopt minor in the Placer County Superior Court. They also filed a petition to terminate father's parental rights, contending that since he learned of her pregnancy, father failed to assist mother either financially or emotionally. The Sacramento County case involving paternity was transferred to Placer County.

The DNA test indicated a 99.23 percent probability that father was minor's biological father. The parties stipulated to biological paternity. Father sought sole legal and physical custody of minor, and was granted supervised visitation for two hours twice a week.

The court held a two-day trial at the end of July 2010 on the petition to terminate father's parental rights. At trial, mother and father testified and presented starkly different versions of their life together before minor's birth. Mother testified father had never assisted her financially while she was pregnant and she never asked him to. He might have given her little things, like a $5 tool for her phlebotomy class and laundry detergent. Father did not buy clothes for her or the baby. The relationship was one-sided; she bought almost everything and father did not provide emotional support. She sought adoption because father lacked maturity and responsibility. Mother could not support another child and she believed neither could father.

Mother's teenage daughter testified that father was nice at first, but then became aggressive and possessive. He would sometimes block mother from leaving, and she recognized signs of potential domestic violence that she had learned from a WEAVE (Women Escaping A Violent Environment) program. She was concerned for mother's safety. Father called mother mean, derogatory names.

Father had two daughters from a previous marriage, ages 12 and 13. He owed $18,813.33 in child support. His current support order was $228 a month and he paid an extra $60 for arrearages. Although he had not seen his children in three years due to their living out of state, he described his relationship with them as "awesome" and testified that they talked "all the time on the Internet" and on the phone several times a month. His daughters sent a letter of support claiming father was "a good guy" who did "a good job at being a father." Father claimed he had taken an active role in raising his daughters before the divorce.

---

case bore the same case number as father's petition to establish paternity. Further, we find it extremely unlikely that the request to restrain *father* would have been denied and the previous orders dismissed had *father's* testimony been disbelieved.

From 1994 until about 2005, father was addicted to methamphetamine and committed various crimes to support his habit. His criminal record included convictions for violation of a court order, possession of controlled substances, reckless driving in lieu of driving under the influence, receiving stolen property, and grand theft. He owed $15,000 in fines and restitution from his criminal convictions.

Following his conviction for possession of methamphetamine and driving under the influence, father had entered a Salvation Army rehabilitation program for a year. The program included work therapy, counseling, anger management, Bible study, and attendance at five AA (Alcoholics Anonymous)/NA (Narcotics Anonymous) meetings per week. He also volunteered for community service projects. He was removed from the program once for not following the rules, but ultimately graduated.

Father testified he would take care of his child "the best way I know how." He was elated about having a baby. Father claimed that he had bonded with his daughter and never missed his twice-weekly visitation. He lived rent free in his godmother's four-bedroom house with his godmother and two other adults.[4] His godmother, who had refused to help him while he was an addict, believed his recovery was successful and he could be a stable parent and meet minor's needs.

In closing arguments, the parties disagreed on whether father qualified as a *Kelsey S.* father. L.R. and K.R. argued that by making mother afraid of him, father had foreclosed any claim he may have had to *Kelsey S.* fatherhood. Father argued he was a *Kelsey S.* father because he had come forward to establish paternity, tried to get married, and paid expenses commensurate with his ability to do so. He questioned what else he could have done.

In his trial brief, father had argued that the detriment standard of Family Code[5] section 3041 applied. He argued that if the court found him to be a *Kelsey S.* father, then the standard for termination of parental rights was not the best interest of the child but detriment to the child or unfitness.[6]

---

[4] The godmother testified father did not pay rent because he could not afford both rent and legal fees.

[5] Further undesignated statutory references are to the Family Code.

[6] As we discuss in the unpublished portion of our opinion, *post*, detriment to the child and parental unfitness are different standards. Detriment to the child is the standard under section 3041 for granting custody to a nonparent. The standards for parental unfitness are set forth in sections 7820 to 7829.

L.R. and K.R. requested leave to file for guardianship, if the court found father could legally block the adoption. The court instructed them to wait for a ruling and then make appropriate actions or applications.

### Statement of Decision/Tentative Ruling

In a statement of decision, later characterized by the trial court as its "tentative decision," filed on October 20, 2010, the court found father participated as far as mother would allow during her pregnancy and attempted to marry her, concluding that he was a *Kelsey S.* father. The court then turned to the "question of unfitness," which it characterized as the question whether "the court believe[s] there will be actual harm to the child if the child were to live with father." The court applied section 3041, which sets forth requirements for a *custody* award to a nonparent.[7] It reasoned that since the adoption proceeding was more permanent than custody, the custody standards were appropriate. The court found father "unfit," which the court defined as causing "actual harm or detriment to the child."[8] The court opined father was controlling and domineering in relationships; he viewed women as possessions. He had violated domestic violence laws and related court orders concerning other women. There was no evidence father provided financial support to mother and the court concluded he provided no emotional or loving support.

The court had reservations about father because of the character of his testimony and his demeanor while testifying. The court found that father was a recovering drug addict and alcoholic, with a 13-year span as a drug addict and criminal, opining that father had been clean and sober at most two years and the evidence suggested otherwise.[9] He was substantially in arrears in child support and, while fully employed, made no effort to repay his fines and restitution. He was not in a relationship with someone who could help raise an infant; his home with other adults was neither "sufficient nor appropriate" to raise minor. There was no evidence father sent cards, gifts, or clothing to the adoptive parents. He had no "real plan," no "specifics." The court found these determinations were predictive of actions that could be considered actual harm and father's past reflected the potential for harm.

---

[7] Section 3041, subdivision (a) provides in pertinent part: "Before making an order granting custody to a person or persons other than a parent, over the objection of a parent, the court shall make a finding that granting custody to a parent would be detrimental to the child and that granting custody to the nonparent is required to serve the best interest of the child."

[8] As we explain in the unpublished portion of our opinion, *post*, this definition was incorrect.

[9] Mother testified both she and father drank, but both quit once she became pregnant. The apartment manager testified there was drinking in father's previous apartment, but not the one he had shared with mother. He had previously smelled alcohol on father, but did not see him drink. There was no evidence that father had resumed use of methamphetamine.

The court concluded father would not meet minor's needs and could not "provide the stability and protection" that the prospective adoptive parents could. Because placing minor with father posed a substantial risk of harm to her and "her best interests are served by not placing into [*sic*] an unfit home," the court found detriment and best interests by clear and convincing evidence.

### Subsequent Proceedings

Fifteen days before the statement of decision was issued, on October 5, 2010, K.R. filed for dissolution of marriage from L.R.[10] The court was not aware of the dissolution request at the time it issued its statement of decision and on November 10, 2010, it held a hearing on whether to reopen the termination case. Finding that "stability" for minor was a significant factor in its earlier decision, the court stayed its statement of decision for reconsideration and continued visitation.

At the continued hearing pending reconsideration held on April 12, 2011, father, now represented by new counsel,[11] argued, among other things, that the court needed to reexamine its finding that father was "an unfit parent." He pointed out both in his posttrial briefing and argument that section 7807 stated that in a determination of parental rights, the court *should not* rely on section 3041.

In a "postjudgment"[12] order filed on May 2, 2011, the court found no basis to disturb or modify its decision terminating father's parental rights. Reiterating that father was clearly a *Kelsey S.* father, the court nonetheless found him "incapable" of parenting minor. The court struck the portions of its initial decision that referenced the stability of the prospective adoptive home and also any mention of section 3041 "insofar as a finding of detriment." Counsel for L.R. was ordered to prepare and submit the final judgment in conformity with the October 2010 statement of decision and the May 2011 "postjudgment" order.

### Judgment

In the judgment terminating father's parental rights, filed on July 20, 2011, the court again found father to be a *Kelsey S.* father, citing his participation,

---

[10] K.R. later withdrew his request for adoption and consented to L.R.'s proceeding with the adoption as a single parent.

[11] The court appointed counsel for father after his prior counsel withdrew because father could not pay him.

[12] As this "postjudgment" order was filed over two months *before* the judgment, it appears that the order was in fact intended as a "posttrial" order, as "posttrial" was the designation for briefing during the time that the statement of decision was under reconsideration.

as far as mother would allow, in prenatal care, his attempt to marry mother, their living together a short time, and father's seeking a determination of paternity and DNA testing.

The court opined that a finding of unfitness required clear and convincing evidence that living with father would cause actual harm or detriment to minor. Holding that its factual findings in its statement of decision made the requisite showing, the court ordered father's parental rights terminated.

## DISCUSSION

### I

*Termination of Parental Rights in the Adoption Context*

#### A. *Parent/Child Relationship*

■ " ' "[E]stablishment of the parent-child relationship is the most funda-mental right a child possesses to be equated in importance with personal liberty and the most basic of constitutional rights." ' [Citation.] Likewise, parents have a fundamental liberty interest in the custody, care, management and companionship of their children. [Citations.] Given the supremacy of these familial rights—of the child and of the parent—a decision to terminate parental rights is one of the gravest a court can make. Thus it is only under specified circumstances, and upon specific findings that include the interests of the child, that a court has authority to terminate parental rights." (*Kristine M. v. David P.* (2006) 135 Cal.App.4th 783, 791 [37 Cal.Rptr.3d 748].)

"Parenting is a fundamental right, and accordingly, is disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood." (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514].) "We have previously recognized that ' "the interest of a parent in the companionship, care, custody, and management of his children is a compel-ling one, ranked among the most basic of civil rights [citations] . . . ." ' [Citations.] A parent's interest in maintaining a parent-child relationship is an extremely 'important interest' [citation], and termination of that right by the state must be viewed as a drastic remedy 'to be applied only in extreme cases' [citation]." (*Guardianship of Christian G.* (2011) 195 Cal.App.4th 581, 597–598 [124 Cal.Rptr.3d 642].)

### B. *Fathers—Presumed and* Kelsey S.

"If a man is the presumed father of a child, the child cannot be adopted without his consent [citation], unless the trial court finds, on statutorily specified grounds, that he is unfit. [Citation.] If, however, he is not a presumed father of a child, the child can be adopted without his consent, and his parental rights can be terminated, unless the court determines it is in the child's best interest for him to retain his parental rights. [Citation.]" (*Adoption of Daniele G.* (2001) 87 Cal.App.4th 1392, 1394–1395 [105 Cal.Rptr.2d 341].)

Generally, a man is presumed to be the natural father of a child if he is married to, or has attempted to marry, the child's mother when the child is born, or he has received the child into his home and he holds the child out as his natural child. (§ 7611.) Father does not contend that he meets the statutory definition of a presumed father.

In *Kelsey S., supra,* 1 Cal.4th 816, our Supreme Court established an exception to the rule permitting adoption without the consent of a father who is not a presumed father. The court held that a biological father "has a constitutionally cognizable opportunity interest in developing a relationship with his child." (*Kelsey S., supra,* 1 Cal.4th at p. 844.) "The biological connection between father and child is unique and worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full, and enduring relationship." (*Kelsey S., supra,* at p. 838.)

"If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother.

"A court should consider all factors relevant to that determination. The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and

birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Kelsey S., supra*, 1 Cal.4th at p. 849, fns. omitted, original italics.)

The burden is on the biological parent to establish the factual predicate for *Kelsey S.* rights. (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679–680 [87 Cal.Rptr.3d 135].)

The parental rights of a *Kelsey S.* father, including the right to withhold consent to an adoption, cannot be terminated unless he is found "statutorily unfit under section 232 [(now §§ 7820–7829)]." (*Kelsey S., supra*, 1 Cal.4th at pp. 850–851.) This finding must be by clear and convincing evidence. (§ 7821.) The grounds for parental unfitness include abandonment (§ 7822), disability due to alcohol or controlled substance abuse (§ 7824), and conviction of a felony, the facts of which prove unfitness (§ 7825).

II

*Sufficient Evidence of Father's* Kelsey S. *Status*

L.R. contends that, notwithstanding father's claim that the trial court erred in its analysis of father's fitness, the trial court's decision was correct because there was insufficient evidence that father was a *Kelsey S.* father. We consider this issue first despite its later appearance in the briefing, as it is presented to us as potentially dispositive of the issue raised by father. Since father was not a *Kelsey S.* father, the argument goes, he could not block the adoption and his parental rights were properly terminated to allow the adoption to proceed.

A. *Code of Civil Procedure Section 906*

Father first responds that L.R. cannot challenge the trial court's finding that he was a *Kelsey S.* father because she did not cross-appeal from the judgment. He contends the determination of his *Kelsey S.* status is now final.

"It is a general rule a respondent who has not appealed from the judgment may not urge error on appeal. [Citation.] A limited exception to this rule is provided by Code of Civil Procedure section 906, which states in pertinent part: 'The respondent . . . may, without appealing from [the] judgment, request the reviewing court to and it may review any of the foregoing [described orders or rulings] for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken.' 'The purpose of the statutory exception is to allow a respondent to assert a

legal theory which may result in affirmance of the judgment.' [Citation.]" (*Hutchinson v. City of Sacramento* (1993) 17 Cal.App.4th 791, 798 [21 Cal.Rptr.2d 779].)

A review of an intermediate ruling may be necessary to show "the appellant suffered no prejudice. In other words, no foul, no harm." (*Erikson v. Weiner* (1996) 48 Cal.App.4th 1663, 1671 [56 Cal.Rptr.2d 362].) Here, if father was *not* a *Kelsey S.* father, his parental rights may be terminated under the far less stringent best interests of the child standard. (*Adoption of Daniele G., supra*, 87 Cal.App.4th 1392, 1395.) In that case, the trial court's error in determining his unfitness would likely be harmless error.

Father contends the rule of Code of Civil Procedure section 906 does not apply because the issue of whether he is a *Kelsey S.* father is not interdependent upon the issue of the standard for terminating parental rights. We disagree; whether father is a *Kelsey S.* father *determines* what is the appropriate standard for termination of his parental rights. The two issues could hardly be more interwoven.

In *Adoption of Lenn E.* (1986) 182 Cal.App.3d 210 [227 Cal.Rptr. 63] (*Lenn E.*), the court considered an issue raised by the respondent despite the lack of a cross-appeal. In *Lenn E.*, after the father killed the mother, the paternal grandmother took custody of the child and sought to adopt him. The maternal grandparents sought leave to intervene and it was granted. (*Lenn E., supra*, 182 Cal.App.3d at pp. 212–213, 217.) The respondents, the paternal grandmother and her husband, applied to vacate the order granting leave to intervene. Their application was denied. (*Lenn E., supra*, at p. 217.) On appeal by the maternal grandparents, the respondents claimed the appellants lacked standing to appeal. The appellate court found the order denying the motion to vacate was appealable. While the respondents cited no authority to explain their failure to file a cross-appeal, the court elected to address the issue of standing. It relied on Code of Civil Procedure section 906, a codification of the rule that " 'a respondent may assert a legal theory which, if found to be sound, should result in affirmance notwithstanding appellant's contentions.' " (182 Cal.App.3d at p. 218.)

Because L.R.'s claim that the trial court erred in finding father to be a *Kelsey S.* father, if found to be valid, would result in affirmance notwithstanding father's contention that the trial court erred in determining his unfitness, we now address the issue of whether father was properly found to be a *Kelsey S.* father.

B.  *Sufficiency of Evidence*

"When deciding whether a parent meets the requirements under *Kelsey S.*, appellate courts have reviewed the ruling for substantial evidence. [Citations.] The burden is on the biological parent 'to establish the factual predicate' for *Kelsey S.* rights. [Citation.] To the extent that the issue is a mixed question of law and fact, we exercise our independent judgment in measuring the facts against the applicable legal standard. [Citation.]" (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539 [135 Cal.Rptr.3d 636] (*Myah M.*).)

The trial court found father was a *Kelsey S.* father because he participated, as far as mother would allow, during prenatal care. He attempted to marry mother; their relationship was terminated by mother, who then blocked father from receiving any information on the yet unborn minor. Father almost immediately sought the court's protection by filing an action to determine paternity and by obtaining DNA testing to determine parentage.

■ Unquestionably, father publicly acknowledged paternity and took prompt legal action to seek custody of minor. He was described as "elated" about becoming a father. Shortly after the DNA test results showed a high probability that he was the father, father actively sought physical and legal custody of minor.[13] He visited as regularly as permitted; there is no evidence in the record that he missed any visits with minor. Nor is there any evidence that the visits did not go well.

Father tried to live with mother and planned on marrying her. They moved together to a two-bedroom apartment. Later, father lived in a house, where he had provisions for minor, including a crib and changing table. While the trial court found this home did not "seem sufficient or appropriate to raise a child," the court did not explain its finding and no evidence in the record supports it. Father accompanied mother to medical appointments during her pregnancy and obtained copies of sonograms; he only failed to attend when prevented by mother. He maintained contact with minor as often as he was permitted. He claimed they had bonded and described their activities during visitation. He made an offer of proof that another witness would testify that he and his child had bonded. His testimony and offer of proof were never challenged or countered.[14]

L.R. contends father does not meet the standards of a *Kelsey S.* father because he engaged in angry outbursts, assaultive conduct, and sexually

---

[13] By contrast, the father in *Myah M.*, who was found *not* to be a *Kelsey S.* father, failed to promptly defend his custodial rights and was not able or willing to take immediate custody of the child. (*Myah M., supra,* 201 Cal.App.4th at p. 1540.)

[14] The record reflects only that the trial court found father less than credible when he testified about certain aspects of his relationship with/efforts to support *mother.*

inappropriate conduct with a teenager. She compares father to the father seeking *Kelsey S.* status in *In re T.R.* (2005) 132 Cal.App.4th 1202 [34 Cal.Rptr.3d 215] (*T.R.*). The comparison is not apt.

The nonbiological father seeking *Kelsey S.* status in *T.R.* was a convicted child molester who was being investigated for inappropriate conduct with the 10-year-old child, including having the child lie on his lap with her pants and underwear at her ankles as well as lying in bed under the covers with the child. (*T.R., supra,* 132 Cal.App.4th at pp. 1206–1207.)

Here, the claim of "sexually inappropriate behavior" is based on the testimony of mother's teenage daughter that father once came in the computer room to thank her and kissed her neck; her response was "ewww." The trial court questioned the daughter, eliciting that she would support mother no matter what and her testimony was intended solely to support mother. The court did not cite this evidence in its factual findings, and it does not appear the court credited this testimony. In any event, the alleged inappropriate behavior falls well short of that illustrated by *T.R.*

Likewise, *In re Charlotte D.* (2009) 45 Cal.4th 1140 [90 Cal.Rptr.3d 724, 202 P.3d 1109] (*Charlotte D.*) cited by L.R., is easily distinguished from this case. The father in *Charlotte D.* had a current drug and alcohol problem. His child lived with the father's parents while the father was in jail on a domestic violence charge. After he was released from jail, the father had subsequent arrests and incarcerations, including taking the child with him while he went shoplifting. (*Charlotte D., supra,* 45 Cal.4th at pp. 1143–1144.) The father frightened the child by placing the family cat in a bag and swinging it until the cat screamed. The father raged at his mother and struck his father with a car, breaking his leg. His parents (the child's grandparents) obtained a restraining order. (*Charlotte D., supra,* at p. 1144.) Supervised visits with the child did not go well and the child felt unsafe with her father. The father was subsequently convicted of a number of offenses and placed in a substance abuse facility. (*Id.* at p. 1145.) Our Supreme Court found the father fell far short of the level of parental commitment required by *Kelsey S.* Once his parents established guardianship, he abandoned his responsibilities and formally waived his parental rights. These facts alone precluded *Kelsey S.* status. His subsequent conduct—behaving inappropriately and even cruelly to the child and his parents—confirmed his irresponsibility as a parent. (*Id.* at p. 1149.)

Father's transgressions pale by comparison. He never abandoned minor or waived his parental rights. He had no current drug, alcohol, or criminal conduct. While the trial court found father was controlling and domineering and viewed women as possessions, it made no factual findings of *any* hint of

intended violence toward minor, and no factual findings of any actual violence toward mother. Tellingly, mother was unable to obtain a restraining order. Further, there was no evidence of *any* inappropriate behavior toward minor.

L.R. relies on the court's finding that father did not financially or emotionally support mother during her pregnancy, and we agree that this is a factor we consider, but the cases cited by her briefing are distinguishable. In *In re Elijah V.* (2005) 127 Cal.App.4th 576 [25 Cal.Rptr.3d 774] (*Elijah V.*) a biological father who, at most, sent $300 and diapers for a year was found not to be a *Kelsey S.* father. In *Elijah V.*, however, the father did not publically acknowledge his paternity, telling only his mother. When his paternity was questioned, he lost interest. He never tried to parent the child and never claimed he was willing to take full custody. Instead, he said he was in " 'no position' " to take the child and placing the child with him would be "abuse." (*Elijah V., supra*, 127 Cal.App.4th at p. 583.)

In the instant case, the record is clear that father had limited financial resources and large financial commitments—child support obligations, restitution and fines, and legal expenses. He testified he could not obtain insurance for minor until she was in his house. He failed, however, to show he paid "pregnancy and birth expenses commensurate with his ability to do so." (*Kelsey S., supra*, 1 Cal.4th at p. 849.) During some portion of the relevant time period, he had a job and he did not establish to the trial court's satisfaction either that he helped to support mother and minor or that he was *completely* unable to do so. Nonetheless, L.R. cites no case—and we have found none—that denied a father, who promptly acknowledged paternity, accompanied mother to prenatal care, visited his child, was willing and able to immediately take custody of his child, and took extensive legal action to secure his parental rights and custody of his child, *Kelsey S.* status solely on the basis of his failure to provide financial assistance to the mother and his less than ideal relationship with her.

There is substantial evidence to support the trial court's finding that father qualifies as a *Kelsey S.* father.

III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 455.

## DISPOSITION

The judgment terminating father's parental rights is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion, including the determination of custody and visitation.

Robie, Acting P. J., and Hoch, J., concurred.