Filed 2/26/13  In re J.M. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | |
| K.W., <br><br>          Plaintiff and Appellant, <br><br> v. <br><br> SAN MATEO COUNTY HUMAN SERVICES AGENCY, <br><br>          Defendant and Respondent. | A135155 <br><br> (San Mateo County <br> Super. Ct. No. 81723) |

        When J.M. (the minor) was born, her mother (Mother) was living with D.M. (D.), who claimed the minor as his child.  At age three months, the minor was detained by the San Mateo County Human Services Agency (Agency) after being hospitalized with injuries suggesting abuse.  During subsequent proceedings, D. was designated the minor's presumed father, but DNA testing demonstrated that K.W. (K.) was her biological father.  K. moved to assert a constitutional right to presumed father status under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*), but the juvenile court denied the motion.  We affirm.

## I.  BACKGROUND

        The minor was the subject of a dependency petition under Welfare and Institutions Code section 300, subdivisions (b) and (e), filed September 6, 2011.  At the time of filing, the minor was three months old.  The petition alleged the minor had been admitted

to the hospital with symptoms, including seizures, brain hemorrhaging, and bone fractures, that are telltale signs of physical abuse. The minor's "sole caregivers," her Mother and D., "provided an explanation for the injuries that is inconsistent with accidental trauma." Amended and second amended petitions were filed in January 2012 containing materially identical jurisdictional allegations.

D. and Mother are not married, but D. lived with Mother prior to and after the minor's birth, was present at the birth, and was listed as father on the birth certificate. DNA testing, however, eventually identified K. as the minor's biological father.

Notwithstanding the test results, D. continued to hold the minor out as his child, while K. had never been a part of the minor's life. At a hearing in January 2012, the parties stipulated to D.'s designation as presumed father, subject to K.'s later assertion of parental rights. At the same hearing, the juvenile court sustained the allegations of the second amended petition without contest and declared the minor a ward of the court. The minor was continued in an out-of-home placement, but Mother and D. were granted visitation and reunification services.

In a motion filed a week later, K. sought to be named the minor's presumed father. While recognizing D.'s statutory qualification for presumed father status, K. argued he was entitled to assert the constitutional rights of a diligent biological father under *Kelsey S.*, *supra*, 1 Cal.4th 816.

At a March 2012 evidentiary hearing on K.'s motion, Mother and K. gave very different accounts of the events following the minor's conception. Mother testified she was living with K. when she became pregnant with the minor in October 2010. As soon as she learned of the pregnancy, she informed K., assuming the child was his. The two began making plans for the baby, but K. moved to Los Angeles a week later. Although he told Mother he would be back in a few weeks, he never returned. Mother, who felt "abandoned," attempted to telephone him many times, but "he didn't answer or he would hang up." After leaving for Los Angeles, K. showed no interest in the pregnancy and offered no financial support for Mother. K. returned to the Bay Area in January 2011.

2

Mother hoped to resume their relationship, but K. was incarcerated in February. Following K.'s incarceration, Mother heard nothing more from him.

Mother said she began a romantic relationship with D. in November 2010, although the two had met and had sexual relations earlier. The relationship lasted for a time, broke off, and then resumed shortly before the minor's birth. During the last month of Mother's pregnancy, D. cared for both Mother and her older child, who was still a toddler. D. was present at the minor's birth and executed a declaration of paternity. Although he was aware of the possibility the minor was not his natural child, he and Mother continued their relationship after the birth, planning to raise the minor together.

According to Mother, K. made no attempt to contact her after his release from jail in June 2011. Two months after the minor's birth, in August, Mother called K. from the hospital to ask whether K. had a family history of seizures. Mother acknowledged refusing to tell K. where the minor was and saying K. was not the minor's father, but she denied telling K. the minor had died.

K. testified his romantic relationship with Mother last about 18 months, ending in January 2011. When he found out about the pregnancy the prior October, he was "nervous, but enthused" and planned with Mother to create a family. Soon after, he went to San Diego for two weeks of job training. During that time, they had frequent pleasant telephone conversations. When the training was over, K. took a job in Oakland and lived with his sister in Emeryville. While there, he tried to see Mother several times. She put him off, claiming D. was the minor's father. She also moved around, making it difficult for him to find her. When he finally saw her in January, he gave her a "diaper bag full of baby accessories," as well as food. He admitted providing no other financial support.

During his incarceration, K. often tried to contact Mother, but her telephone number was blocked to collect calls. He did not write Mother care of her mother's address because he understood her mother had moved. K. learned about the birth of the minor soon after being released from jail in late June 2011 and tried to contact Mother, but her telephone number had been changed. He admitted placing a post on Facebook

3

asserting the minor was not his child, but he said he was "heartbroken" that Mother was excluding him from the minor's life.

According to K., when Mother called him from the hospital in August, she told him the minor was having seizures, but she never asked him about his family's medical history. She refused to tell him which hospital, claiming he was not the father. Soon after, Mother left him a message saying the minor had died and asked him not to contact her again. It was not until December that he learned through the Agency the minor was in foster care. When he contacted a social worker, he insisted he was the minor's father and sought custody.

D. also testified at the hearing. He explained he met Mother on the Internet in October 2010 and they had sexual relations in November. He had no further contact with her until May 2011. At that time, he moved in with Mother and her grandmother, caring for Mother and her child and sharing his government assistance money. At that time, prior to the minor's birth, he told others the minor was his child. He went with Mother to the hospital for the birth and was listed as her father on the birth certificate at his own insistence. Following the birth, he cared for the minor, continued to share his limited income, and treated the minor as his own child, telling others she was his. This did not change after he learned he was not her biological father, and D. hoped to continue to act as her parent. He and Mother were engaged to be married.

The juvenile court denied K.'s motion, stating that his efforts to connect with the minor "were less than immediate." Although the court believed the "princip[al] obstacle" to K.'s uniting with the minor was "the obdurate attitude of the child's mother," it found K. also "exhibited failures of his own and immaturity of his own that suggests to me that on the three points set forth in [*Kelsey S.*] he has not demonstrated his present ability to fulfill the role of presumed father." Although the court declined to remove D. as presumed father, it did order the Agency "to initiate an investigation into the propriety of [providing reunification] services" to K. K. was also granted visitation with the minor pending the results of the investigation.

4

At the time the appellate record closed in this matter, April 2012, Vacaville police were reported to be conducting a criminal investigation into the minor's injuries. The investigators suspected D. of having caused the injuries, but they had reached no conclusions. The record also contains two physician's reports contradicting the Agency's allegations and stating the minor's injuries are not consistent with child abuse.

## II. DISCUSSION

K. contends the juvenile court erred in failing to grant him presumed father status under *Kelsey S.* and, alternatively, abused its discretion in failing to designate him the presumed father on the basis of his biological paternity.

The law of presumed fatherhood was explained in *In re J.L* (2008) 159 Cal.App.4th 1010 (*J.L.*):

"The Uniform Parentage Act (Fam. Code,[1] § 7600 et seq.) (Act) provides the statutory framework by which California courts make paternity determinations. [Citations.] Under this statutory scheme, California law distinguishes 'alleged,' 'biological,' and 'presumed' fathers. [Citation.] 'A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an "alleged" father. [Citation.]' [Citation.] 'A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status . . . .' [Citation.]

" 'Presumed' fathers are accorded far greater parental rights than alleged or biological fathers. [Citation.] Presumed father status is governed by section 7611, which sets out several rebuttable presumptions under which a man may qualify for this status, generally by marrying or attempting to marry the child's mother or by publicly acknowledging paternity and receiving the child into his home. [Citations.] Biological fatherhood does not, in and of itself, qualify a man for presumed father status under section 7611. On the contrary, presumed father status is based on the familial relationship between the man and child, rather than any biological connection. [Citation.]

---

[1] All statutory references are to the Family Code.

"Section 7611 also recognizes two other grounds for qualification as a presumed father that are outside of the Act, [including execution of a declaration of paternity]. . . . In addition, . . . an unmarried biological father may, under narrow circumstances, assert constitutional paternity rights, even though he does not qualify under any of the presumptions listed in section 7611. [Citations.]

"Occasionally the complicated pattern of human relations gives rise to more than one legitimate claimant to presumed father status, and the juvenile court must resolve the competing claims. As the Supreme Court explained . . . , '[a]lthough more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, "there can be only one presumed father." [Citations.]' The procedure for reconciling competing presumptions is stated in section 7612, which provides: '(a) . . . a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence. [¶] (b) If two or more presumptions arise under Section 7611 which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls.' " (*J.L., supra*, 159 Cal.App.4th at pp. 1018–1019.)

K., who concededly does not qualify for presumed father status under any of the presumptions of section 7611, seeks to assert his constitutional paternity rights as an unmarried biological parent under *Kelsey S.* Again as explained in *J.L.*:

"*Kelsey S.* was a challenge to the adoption of a newborn child of an unwed mother, which was filed by the child's biological father within two days after the baby's birth. [Citation.] In analyzing the biological father's rights, the Supreme Court began by observing that the Act precludes an unwed biological father from achieving presumed father status unless he is able to satisfy section 7611, subdivision (d) by taking the child into his home and holding it out as his own. [Citation.] As a result of this statutory structure, the mother of such a child can deny presumed father status to the biological father by giving the baby up for adoption, thereby preventing the father from satisfying subdivision (d). [Citation.] After extensive discussion, the court concluded that this feature of the Act was irrational for two reasons. First, a good potential father could be

6

denied parental rights by the unilateral decision of the mother, while an unfit mother could have her rights terminated only by statutory procedures. Second, the mother could deny 'a model [biological] father' presumed father status while permitting another man 'of dubious ability and intent' to achieve presumed father status merely by allowing him to live with the child in her home for a brief period. [Citation.] Accordingly, the court held that, notwithstanding section 7611, '[i]f an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent.' [Citation.]

"The court emphasized that its decision applied only in narrow circumstances, when 'an unwed father . . . has sufficiently and timely demonstrated a full commitment to his parental responsibilities.' [Citation.] In deciding whether a particular biological father qualifies, the court instructed juvenile courts to consider 'all factors relevant to that determination. The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate "a willingness himself to assume full custody of the child—not merely to block adoption by others." [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child.' [Citation.]

"Although section 7611 makes no provision for a *Kelsey S.* father in its list of presumptions, a father asserting valid *Kelsey S.* rights may effectively qualify for presumed father status as the result of his constitutional right to parent, which overrides any contrary statutory direction." (*J.L., supra*, 159 Cal.App.4th at pp. 1022–1023.)

## A.  Kelsey S. *Status*

K. had the burden of demonstrating the factual basis for his claim to *Kelsey S.* rights. (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679.) We review the juvenile

7

court's determination that he did not meet that burden under the substantial evidence test. (*Id.* at pp. 679–680.) The substantial evidence standard is "highly deferential." (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 447.) In applying that standard, "[w]e review the entire record to determine whether there is any substantial evidence, 'whether or not contradicted, which will support the conclusion of the trier of fact. [Citation.] All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the decision, if possible. We may not reweigh or express an independent judgment on the evidence.' " (*In re N.M.* (2009) 174 Cal.App.4th 328, 335.)

Mother's testimony provided substantial evidence to support the juvenile court's determination that K. did not qualify for *Kelsey S.* status. Under *Kelsey S.*, a biological father is required, "[o]nce [he] knows or reasonably should know of the pregnancy," promptly to "attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit." (*Kelsey S., supra*, 1 Cal.4th at p. 849.) According to Mother, K. left for Southern California within a week after learning of her pregnancy. Thereafter, she heard almost nothing from him until two months after the birth. During that time, she did nothing to prevent him from assuming his responsibilities as the minor's prospective parent. Yet he provided no financial or emotional support to her, did nothing to suggest he was willing to share custody of the baby, and took no legal action to seek custody.[2] A biological father who learns of the pregnancy prior to the baby's birth yet does nothing to assume parental responsibilities until after the birth is not entitled to *Kelsey S.* status. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1055.)

K.'s argument for *Kelsey S.* status is based largely on his own testimony, in vain disregard of our standard of review. Yet even if we take K.'s testimony at face value, it fails to satisfy *Kelsey S.* As K. acknowledged, he left for Southern California soon after the pregnancy was announced. After he returned to the Bay Area, he provided Mother

---

[2] K. points out he was incarcerated for a portion of this time, but incarceration does not relieve a biological father of his duties under *Kelsey S.* (*Adoption of O.M.*, *supra*, 169 Cal.App.4th at p. 680.)

with no financial support beyond a diaper bag full of baby items, although he was in contact with Mother, knew she needed help, and was working at the time. While K. claims Mother put him off by asserting he was not the father, K. was aware the minor might be his child, since he was having sexual relations with Mother at the time of the minor's conception. Yet following the minor's birth, K.'s attempts to contact Mother were half-hearted, and he made no attempt to prove his paternity or seek custody. On the contrary, he posted a message on Facebook questioning, rather than acknowledging, his paternity. (Compare, e.g., *Adoption of H.R.* (2012) 205 Cal.App.4th 455, 468 [biological father qualified under *Kelsey S.* when he participated in prenatal care and, after being excluded by mother, filed an action claiming paternity, obtained his own DNA test, and actively sought physical and legal custody].) K.'s ambivalent conduct was an insufficiently prompt and unequivocal assertion of parental rights to qualify under *Kelsey S.*

## B. *Presumed Father Status*

Regardless of his entitlement to *Kelsey S.* rights, K. appears to contend the juvenile court should have designated him, rather than D., the presumed father on the basis of his biological parentage. Because biological parentage alone is not one of the statutory presumptions under section 7611, it is not clear the juvenile court could have designated K. as a presumed father over D. According to *Kelsey S.*, a biological father who fails to qualify under section 7611 is merely a "natural father," not entitled to the various rights of a presumed father. (*Kelsey S., supra*, 1 Cal.4th at p. 825; see *In re D.M.* (2012) 210 Cal.App.4th 541, 544 [biological father who does not qualify as presumed father is not entitled to reunification services, but may be granted services at court's discretion].) Nonetheless, because it has recently been suggested a natural father can be considered for presumed father status (*In re P.A.* (2011) 198 Cal.App.4th 974, 981), we consider the argument.

K. waived this argument by not making it in the juvenile court. His motion for presumed father status was based entirely on his claimed entitlement to *Kelsey S.* rights. As he argued in his motion, he "does not qualify as a presumed father under the Family

Code requirements" but is a "presumed father under [*Kelsey S.*]." K. made no argument he should be granted presumed father status even if he failed to qualify for *Kelsey S.* rights.

In any event, we find no abuse of discretion in the court's refusal to select K. as presumed father over D. K. argues D.'s declaration of paternity is invalid, thereby disqualifying him from presumed father status, but D.'s testimony at the paternity hearing demonstrated he was also entitled to presumed father status under section 7611, subdivision (d), because he "receive[d] the child into his home and openly [held] out the child as his natural child." (*Ibid.*) The validity of the declaration of paternity is therefore immaterial.

K. also argues the juvenile court should have denied presumed father status to D. because he was likely responsible for the minor's injuries. At the time of the motion, it had not been clearly established D. had caused the injuries, let alone that he had done so intentionally. In the absence of persuasive evidence of intentional harm, it was reasonable for the court to select D., proven to be a devoted father, over an uninvolved biological parent.

### III. DISPOSITION

The juvenile court's orders granting presumed father status to D. and denying K.'s motion for presumed father status are affirmed.

_____
Margulies, J.

We concur:

_____
Marchiano, P.J.

_____
Dondero, J.

10