Filed 6/26/14  Adoption of K.M. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Adoption of K.M., a Minor. | |
| MICHAEL S. et al., | G049149 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. AD79081) |
| SAMUEL P., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Ronald P. Kreber, Judge.  Affirmed.

Brent Riggs, under appointment by the Court of Appeal, for Defendant and Appellant.

John A. Giffen; Broedlow Lewis, Jeffrey Lewis and Kelly Broedlow Dunagan for Plaintiffs and Respondents.

No appearance for the Minor.

*          *          *

# I.  INTRODUCTION

The issue in this appeal is whether the evidence compelled the trial court to conclude that Samuel, who alleges he is the biological father of K.M., qualifies as a presumed father under standards enunciated in *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, and hence has the right to block the adoption of K.M. by Michael and Tasha. Because the evidence does not compel any such conclusion, we affirm the judgment finding Samuel's consent is not necessary for the adoption.[1]  In overview, this case is a combination of *Adoption of Michael H.* (1995) 10 Cal.4th 1043 [alleged father's delay in asserting parental right between July and November compelled finding that he did *not* qualify under *Kelsey S.*] and *Adoption of O.M.* (2008) 169 Cal.App.4th 672 [the "father's ability to demonstrate his commitment was impeded to a far greater extent by the predictable consequences of his own criminal activity"].)  At the most crucial point in the timeline – when Samuel was first informed of Kathleen's pregnancy – he was incarcerated and unable to commit to providing an income or stable home for the child. Under *Michael H.*, that alone is sufficient to uphold the trial court's judgment.  And there is much more to support the trial court's decision, so we affirm it.

# II.  FACTS

## A.  *Events Prenatal*

K.M. was born in early September 2012.  Both at the time of her conception (about December 2011) and at the time of her birth, her birth mother Kathleen was married to a man named Manuel.  According to Kathleen's declaration filed in support of adoption by Michael and Tasha, Kathleen went to a bar one night, and ended

---

[1]  Technically, Samuel's October 16 notice of appeal, was premature as taken only from an unsigned minute order.  However, a formal order, the equivalent of a judgment, was signed by the trial judge and filed October 23, 2013.  We therefore deem the appeal to be from that formal order, not the mere minute order.  (See Cal. Rules of Court, rule 8.406(d).)

up having sex with three different men, so she didn't know the child's biological father. She did tell Tasha "numerous" times that Samuel "could not" be the father.[2]

Kathleen learned of her pregnancy in February 2012 and, that same month, told Samuel about it. The previous month Samuel had been incarcerated on a drug charge so the visit was at the jail, where he would remain until July. At the time Kathleen told Samuel of the pregnancy, she was living in a motel, having been "forced [] out" – Samuel's own words – of Samuel's father's house, in which she had been living prior to Samuel's incarceration, by Samuel's nieces.[3] Samuel characterized Kathleen's situation as it stood in February 2012 as "homeless."

At the jail Kathleen told Samuel she planned to have the child adopted, but said she wouldn't go through with the adoption if Samuel could provide a "stable home environment" and "could support the family." Samuel told her he could not – as he styled her statement – "'meet her demands.'" He later testified that his reaction at the time was based on being in jail and not having any income, and also on the fact he suffers from several serious ongoing health problems, including "problems" with his liver and his kidneys, manifesting themselves in edema and dehydration.

During the course of Kathleen's pregnancy and his own January-July incarceration, Samuel wrote letters to his father asking him "don't forget to help Katie." He also took, while he was in jail, six to eight weeks of parenting classes.[4] The record is, however, clear that with the exception of procuring a baby crib, and some clothes, toys

[2] Tasha's declaration to that effect was not more specific as to when Kathleen made these statements. We should also note there that even if Kathleen's bar story was pure fantasy and Samuel was the biological father of K.M. it would make no difference to the outcome of this appeal.

[3] In a question posed by his attorney in his own case-in-chief, Samuel was asked about Kathleen's being "somewhat concerned" about her pregnancy. Samuel answered: "Yes. Because of her – at the moment she had my – my family nieces moved her out of the house while I was gone [in jail]. I had a – some family members while I was gone just forced her out, basically, to my father's home and she was helping my mother, who is dying from – she has – she's on hospice and she was her caregiver. And they got another person to care for her and they moved her out of the room while I was incarcerated."

[4] Apparently he was transported to Santiago College for the classes.

3

and diapers placed at his father's house sometime after his release in July 2012, Samuel never paid or offered to pay any actual money for Kathleen's and the unborn child's support both before or after K.M.'s birth.[5]

Kathleen did not instigate dissolution proceedings to end her marriage to Manuel; he did, in March 2012. While the final judgment of dissolution of the Manuel-Kathleen marriage was filed in mid-June 2012, the date the status of marriage was terminated was September 20, 2012. K.M. was born around two weeks before that date.

B. *Birth and Post Birth*

The record is fairly clear that between July 2012 – when Samuel was released – and the September birth, Samuel and Kathleen were living in rooms paid for by prospective adoptive parents – first, a couple who originally hoped to adopt her child and then, in the final month, by Michael and Tasha. In that final month, Samuel and Kathleen were living in a motel in Buena Park near Knott's Berry Farm. Kathleen admitted that the night before the birth, she took "a couple hits" from a friend's methamphetamine pipe, consequently K.M. was born the next day with methamphetamine in her system. Samuel presented no evidence that he was away from the apartment that evening, or that he made any effort to try to prevent a pregnant woman about to give birth from ingesting a harmful, illegal drug.

Samuel was asleep when Kathleen went into labor. Because of mixed-up text messages, Samuel did not reach the right hospital until about 12 hours after the birth. He and his father took pictures of the baby but were otherwise not allowed in the nursery. Kathleen signed papers authorizing the adoption by Michael and Tasha, and reiterated the story there were three possible biological fathers and she did not know who was the

---

[5]     By the time of the hearing, Kathleen had married Samuel and was supporting his quest to block the adoption. She testified that after the birth Samuel "asked a couple times" of Michael and Tasha about possibly paying for the motel room where they put Kathleen up after the birth. However, by then the child was living with Michael and Tasha, and Samuel's own testimony was clear he never offered to pay support for the child.

4

biological father of the child. Tasha was allowed to take K.M. from the nursery the next morning. Kathleen signed papers waiving her right to revoke her consent to the adoption, and Manuel signed a waiver of his right to notice of the adoption. Samuel was not named on the birth certificate. Kathleen testified that, at the time, she "was afraid of him getting her."

For two weeks after the birth Kathleen and Samuel stayed at a motel in Anaheim paid for by Michael and Tasha. After that, they stayed at a room in Garden Grove, again paid for by Michael and Tasha.

Within a week of the birth, Samuel drove to the courthouse where he told a clerk he wanted to stop the adoption, but he had no driver's license to prove his identity. Sometime thereafter he obtained one and returned to the courthouse. He testified that because he did not know the prospective adopters' names, and because he had no case number, he was unable to file anything. He also testified that on the 29th day after the birth he drove with Kathleen to the courthouse, but their truck broke down and the next court day being a holiday, he assumed he had missed the 30-day time limit to file an objection to the adoption. He described his state of mind at that time as "emotional, just drained, thinking it was over."

On October 11, 2012, Michael and Tasha filed the formal adoption proceeding we now review. Nothing happened in the case during the rest of October, but Samuel was once again jailed – albeit, according to his testimony, only briefly and without charges – in November. He made an attempt to contact Tasha in December asking for pictures, but Tasha hung up, telling him to go through their lawyer.

Samuel was jailed again in January 2013, on charges of possessing a controlled substance. He stayed in jail until at least May 15. On February 13, 2013, while still in jail, he called the California Department of Social Services and told an adoption specialist he wanted custody of his child, but had no funds and asked for a pro

bono attorney. The department gave him the name of an attorney, a family law center, and a paralegal center. Samuel presented no evidence he ever contacted any of these entities.

Rather, in May he did some legal work on his own behalf. The circumstances of that work were: On May 15, while still in jail, he was served with the adoption petition in this case. The papers contained a notice he had 30 days after the service of the papers to file an action to establish his own paternity. From his jail cell, Samuel filed, in the period May 17 through 23, a series of handwritten documents, essentially seeking to establish his own paternity and halt the adoption.

These papers generated the hearing on October 9, 2013, leading to the judgment at issue in this case. The trial judge found Samuel was well aware of the planned adoption before the birth of K.M., took no action to ever support the child either before or after birth, and did not qualify as a presumed father under *Kelsey S.* The trial court also found it was in the best interests of K.M. to terminate Samuel's rights. Samuel himself filed the notice of appeal from the initial minute order within the week.

### III.  DISCUSSION

The basic framework governing Samuel's appeal was laid down by our Supreme Court in *Kelsey S.*, *supra*, 1 Cal.4th 816. The *Kelsey S.* court confronted a *statutory* scheme in which a man in Samuel's position – an unwed biological father –has virtually no right at all to contest an adoption.[6] A man might be the biological father of the child (called a "natural father" in the opinion), but statutorily that, by itself, means nothing. Unless the man is a presumed father, he has no parental rights. (*Kelsey S.,*

---

6        There has been no DNA test yet establishing that Samuel is, or is not, the biological father of K.M. Samuel claims his indigency prevented him from paying for one. He did, however, in a handwritten June 2013 filing, "demand[]" – his word – the court pay for one. Since the cases we rely on (*Kelsey*, *Michael H.* and *O.M.*) all assumed that the unwed fathers there were indeed the biological fathers of the children involved, and because we conclude Samuel does not qualify under *Kelsey S.* for non-biological reasons, it makes no difference in this appeal whether Samuel had a DNA test or not.

*supra*, 1 Cal.4th at p. 825 [noting statutory requirement of being a presumed father] and p. 830 [noting statutory scheme allowed mother where natural father was not a presumed father to "unilaterally preclude" natural father of the right he might otherwise have to withhold consent to adoption].)  The *Kelsey S.* court, however, went on to conclude that if the natural father had shown a level of commitment to assuming the responsibilities of parenthood, he could, as a matter of constitutional law, qualify as a presumed father. (See *id.* at pp. 847-848.)  Thus functionally, *Kelsey S.* expands the definition of a presumed father to include a man who does not otherwise qualify under the statute, as long as he meets a certain standard of commitment to parenthood.

But what is that standard?  *Kelsey S.* itself was not a fact-based decision.  It does not, for example, give the reader, as later cases do (indeed, as we have done here) a detailed account of the appellant's behavior vis-à-vis the pregnancy.[7]   But while the court's linguistic formulations were general, the standards enunciated by the court were quite clear and quite high.  The man has to have made "diligent and legal attempts to obtain custody of his child and to rear it himself." (*Kelsey S., supra*, 1 Cal.4th at p. 821.) And even a man who has been "indisputably ready, willing, and able to exercise the full measure of his parental responsibilities can have his rights terminated merely on a showing that his child's best interest would be served by adoption." (*Id.* at p. 847.) Perhaps most importantly, the man must have "'*promptly* taken every available avenue to demonstrate that he is willing and able to enter into the *fullest possible relationship* with his under-six-month-old child.'" (*Id.* at pp. 838-839, italics added [quoting *In re Raquel Marie X.* (N.Y. 1990) 76 N.Y.2d 387, 403].)  The emphasis on promptness was later repeated in the *Kelsey S.* court's encapsulation of its holding:  "The statutory distinction

_____

[7]     And in fact the actual case might ultimately have gone against the man who asserted parental rights in the case.  The Supreme Court did not say he had the right to block the adoption, it merely remanded the matter for further proceedings in the trial court.

between natural fathers and presumed fathers is constitutionally invalid *only to the extent* it is applied to an unwed father who has sufficiently and timely demonstrated a full commitment to his parental responsibilities." (*Id.* at p. 849.)

Promptness and fullness were fleshed out in our high court's next venture into the area of unwed fathers seeking parental rights as a matter of constitutional common law, *Michael H., supra*, 10 Cal.4th 1043. There, the high court reversed a determination of the appellate court that the would-be presumed father *was* a presumed father with directions to enter judgment against him because, *as a matter of law*, he did not qualify under *Kelsey S.*

In *Michael H.*, the trial court found the biological father's efforts to assert his parental relationship were "'were nothing short of impressive,'" and "'truly extraordinary.'" (*Michael H., supra*, 10 Cal.4th at p. 1053.) In particular, in the two years following the birth, the biological father had "never wavered in expressing his desire to take on the full responsibility of fatherhood," and had "'relentlessly'" sought visitation rights (at least by urging the matter on his attorneys). (*Ibid*.) Accordingly, the trial court blocked the adoption, and the appeal in *Michael H.* was by the prospective adoptive parents. The appellate court, however, perceiving *Kelsey S.* to stand for a "'balancing test,'" affirmed the trial court's decision. (*Id*. at p. 1054.)

But the appellate court had misperceived *Kelsey S.* If there was one clear theme to the *Michael H.* opinion, it was that prompt action by the biological father meant action from the very beginning of his fatherhood. Justice Mosk, writing for a six-justice majority in *Michael H.*,[8] eloquently expressed the *Kelsey S.* unwed father problem from the point of view of the mother-to-be: A pregnant woman needs certainty. She must be

---

[8]     Justice Kennard dissented on the point as to whether the biological father *had* been sufficiently prompt, but, thinking the decision in *Kelsey S.* to make it retroactive was a mistake, concurred in the result because too much time had passed while the adoptive parents were raising the child. (See *Michael S.*, *supra*, 10 Cal.4th at pp. 1060-1061, 1071-1073 (dis. and conc. opn of Kennard, J.).)

able to *plan* what to do about her pregnancy. She needs stability. And those needs are thwarted to the degree the unwed biological father doesn't promptly – and *fully* – commit to parenthood.[9] Thus even though the biological unwed father's post natal efforts in *Michael H.* were impressive, his initial prenatal reaction doomed his case. The Supreme Court noted that the trial court had also found between the time the biological father first learned of the pregnancy in early July 1990 until November 1990, he made no attempt to fully commit to his parental responsibilities. (*Id.* at p. 1060.) That not only required reversal, but reversal with directions to enter judgment concluding the biological father had no right to veto the adoption. (*Ibid.*)

*Adoption of O.M.* (2008) 169 Cal.App.4th 672 adds an additional gloss to *Michael H.*'s emphasis on the need to commit fully and promptly that is pertinent here. In fine, *O.M.* obviates much discussion here. It holds that being incarcerated is no excuse. (See *id.* at p. 675.)

In *O.M.*, the biological father was arrested for a parole violation (the violation was use of methamphetamine and marijuana) only a week after the pregnancy was confirmed. (*O.M., supra*, 169 Cal.App.4th at p. 676.) He would stay in jail for four months thereafter. (*Ibid.*) Said the court: "Here, B.R. [the biological father] learned of the pregnancy in February 2006, and L.T. [the mother] did not start refusing to see him at least until sometime in June 2006. B.R. has not established that during the intervening four months, he provided support to L.T. of any kind – financial, emotional, or practical.

---

9    The passage is worth quoting: "John and Margaret [the prospective adoptive parents] also contend their reading of *Kelsey S.* serves several important public policy goals. We find their points persuasive. They first assert that an unwed father should be encouraged to promptly inform the biological mother during pregnancy whether he objects or consents to the child's adoption at birth, and that he should be denied constitutional protection after birth if he concealed his views during pregnancy. *They stress that during pregnancy the mother must make many important decisions, most importantly whether to have an abortion, to prepare an adoption plan, or to keep the baby, and that she has only a relatively short time to make and implement her choice.* It is therefore important that the father give the mother prompt notice whether he plans to object or consent to adoption so that she can evaluate that and other options on an informed basis." (*Michael H., supra*, 10 Cal.4th at p. 1055, italics added.)

All he has shown is that his *parents* furnished her with some clothing and money, though apparently not enough to prevent her from needing the support of T.M. and J.R. once they came into the picture. [¶] The record supports the conclusion that B.R. was prevented from supporting L.T. during the initial period of her pregnancy, before she began refusing to see him, *not because of any unilateral action on her part, but by his own actions in committing the parole violations, including the use of illegal drugs, that led to his incarceration*. We do not discern any violation of equal protection or due process in holding an unwed father's own criminal activity against him when assessing whether he has met the criteria for *Kelsey S.* rights." (*Id*. at p. 680, second italics added.)

The principles stated in *Michael. H.* and *O.M.* cover Samuel's arguments in this appeal. As in *Michael H.*, there was a clear absence of a full commitment to parental responsibility in the critical initial period – here, February to May, in *Michael H.*, July to November – when the prospective mother needed certainty and had to be able to plan a future. And, just as in *O.M.*, Samuel's ability to step forward at the crucial point in time was limited by his own conduct in violating his parole and getting arrested on a drug charge.[10]

We would also note this: Samuel's *strongest* evidence that he was willing to commit to full parental responsibility in the prenatal period was his writing to his father from jail asking his father "don't forget to help Katie." But even *that* evidence is undercut by the fact that after Samuel's incarceration and during the critical early months of pregnancy, Kathleen was *forced out* of Samuel's father's home and rendered homeless. The prospect of being pregnant with a child not by her husband and being homeless to boot must have been terrifying. And yet *that* is the position Kathleen found herself in because of Samuel's violation of his parole.

---

[10] Samuel contended the charges against him were false when he was re-arrested after K.M.'s birth. But the record is absent of any assertion that his initial arrest in January 2012, was anything but valid.

10

Nor did Samuel's efforts at committing to parenthood include any effort on his part to try to dissuade Kathleen from ingesting methamphetamine late in her pregnancy. What was someone doing with a methamphetamine pipe in Samuel and Kathleen's apartment the night prior to K.M.'s birth?

Moreover, even Samuel's efforts in the post-natal period were less than impressive. (And certainly less impressive than the unwed father's efforts were in *Michael H.*) Even crediting Samuel's testimony that he was arrested on false charges, he never quite got his act together in asserting his legal rights with regard to K.M. For example, in February 2013, he was given three legal referrals who, according to the adoption specialist's report, would have helped him free of charge. By that time he certainly would have had access to the case number to give to one of the referrals. But he didn't.

The case relied on by Samuel, *Adoption of H.R.* (2012) 205 Cal.App.4th 455, is inapposite. There, the trial court *did* find the biological father was a presumed father under *Kelsey S.*, and the appellate court found substantial evidence to support the trial court's conclusion. While *H.R.* didn't discuss *Michael H.* at all, it is relatively clear from the opinion that the biological father there had fully committed to his parental responsibilities in the crucial prenatal period. (See *id.* at p. 457 ["Long before minor was born, father had sought to establish his parental rights."].)

## IV. DISPOSITION

Because Samuel does not qualify as a presumed father under *Kelsey S.*, we need not consider the impact of the trial court's finding that termination of Samuel's parental rights and adoption by Michael and Tasha is in K.M.'s best interest. Nor need we consider with the now-academic problem of whether, under *Dawn D. v. Superior*

11

*Court* (1998) 17 Cal.4th 932, Samuel even had standing to contest the adoption in the first place. The judgment of October 23, 2013, terminating Samuel's parental rights for adoption is, accordingly, affirmed. Respondents are to recover their costs on appeal.


                                        BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.


12