[No. S142028. Mar. 19, 2009.]

In re CHARLOTTE D., a Minor.
CORNELIS D. et al., Petitioners and Respondents, v.
RONALD D., Objector and Appellant.

## COUNSEL

Richard C. Gilman, under appointment by the Supreme Court, for Objector and Appellant.

Douglas R. Donnelly; John L. Dodd & Associates and John L. Dodd for Petitioners and Respondents.

No appearance for Minor.

Robert R. Walmsley, Ted R. Youmans and Elizabeth A. Christopher for Academy of California Adoption Lawyers and Academy of California Family Formation Lawyers as Amici Curiae on behalf of Petitioners and Respondents and Minor.

## OPINION

**CORRIGAN, J.**—This case, like *Guardianship of Ann S.* (2009) 45 Cal.4th 1110 [90 Cal.Rptr.3d 701, 202 P.3d 1089] (*Ann S.*), concerns the constitutionality of Probate Code section 1516.5 (hereafter, section 1516.5). Under section 1516.5, parental rights may be terminated based on the child's best interest after two years of probate guardianship, when a guardian seeks to adopt the child.[1] The Court of Appeal below held the statute unconstitutional as applied to unwed fathers who have demonstrated a full commitment to parental responsibility, under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*). The court reasoned that due process requires a finding of parental unfitness before such a father may be deprived of his parental rights. It remanded for the trial court to determine whether the father in this case could show the necessary commitment to parental responsibility.

We reverse. As discussed in *Ann S., supra*, 45 Cal.4th 1110, section 1516.5 does not violate due process on its face by adopting the best interest of the

---

[1] Section 1516.5 does not apply to guardianships established in juvenile dependency proceedings under the Welfare and Institutions Code. (§ 1516.5, subd. (d); see Welf. & Inst. Code, §§ 360, 366.26, 366.3.)

child as the standard for terminating parental rights. However, the statute is open to constitutional challenge as applied to an individual parent. Here, the Court of Appeal erred by deeming father an eligible candidate for constitutional protection under *Kelsey S.* Unlike the petitioner in *Kelsey S.*, he was not prevented by the child's mother from acquiring the statutory rights of a presumed father. (See *Kelsey S., supra,* 1 Cal.4th at pp. 824–825.) Father had those rights, but expressly waived them when his child was placed in guardianship. Furthermore, section 1516.5 applies to him no differently than to any other parent, so the equal protection considerations underlying our decision in *Kelsey S.* are entirely absent.

There may be a case in which a parent who has made the kind of commitment to parental responsibility contemplated in *Kelsey S.* finds it necessary to place a child in probate guardianship for an extended period, and thereafter faces the termination of his or her parental rights under section 1516.5. This, however, is not that case. Father makes no attempt to defend the Court of Appeal's application of *Kelsey S.*, confining his arguments to the facial constitutionality of section 1516.5. Moreover, his relationship with the child was thoroughly explored at the section 1516.5 hearing, and the evidence overwhelmingly established that he was anything but a fully responsible parent.

## I. BACKGROUND

Charlotte D. was born in August 1995 to Ronald D. and Linda C., an unmarried couple. Since June, mother had been living with father's parents, respondents Cornelis and Brigitte D., at their home in Ventura County. Father was in a Nevada jail, having been charged with assault with a deadly weapon after running into two security guards with his car.

In December 1995, mother took Charlotte to live with her and father in Las Vegas. Both parents had drug and alcohol problems. Their relationship was unstable, marked by arguments and domestic violence. When Charlotte was a year old, Brigitte sought intervention from child protective services in Las Vegas. Father was in jail on a domestic violence charge, and mother was unable to care for Charlotte because of her substance abuse. Brigitte told an investigator that Charlotte was placed with a relative who also used drugs, but evidently she was returned to her parents. According to father, he tried to protect the child by taking her away from mother, who abused her. In December 1997, he was arrested again for domestic violence against mother. He "went on the run" with Charlotte, by his own admission, and took her to live with Cornelis and Brigitte, who have had custody of the child since that time. Brigitte retired from her job as a registered nurse to care for Charlotte. Father returned to Nevada and served a jail term.

In 1998, mother filed an action against father in Nevada for violating her custody rights. Father was released from jail and came to live with his parents. Brigitte testified that she and her husband had hoped to help him form a healthy parental relationship with Charlotte, but the attempt was "a disaster." They established rules against drinking, drugs, and foul language, but father was frequently intoxicated and abusive, particularly when Brigitte refused to allow him to drive with Charlotte. He had no driver's license.

In March 1999, the Nevada custody case was resolved by stipulation. Brigitte and Cornelis had joined the litigation, seeking appointment as Charlotte's guardians. Both parents consented to the guardianship and agreed to waive their statutory rights to parental preference in any future custody litigation. Mother was allowed visitation, which she never exercised. Because father was living with the guardians, no visitation was ordered for him. Although he was required to pay $300 a month in child support, he made no payments and was $23,000 in arrears by the time of the section 1516.5 hearing.

While living with his parents, father was cited or arrested for public intoxication, presenting false identification to a police officer, failing to appear, driving under the influence, and carrying a loaded firearm. His disputes with his parents and bouts of intoxication continued. He frightened Charlotte on one occasion by taking her into his room, placing the family cat in a bag, and swinging it around until it screamed. Father moved out of his parents' home at the end of 2001, but the problems persisted. He brought Charlotte to a store where she saw him shoplifting. He took her to liquor stores, where he bought small bottles that he would conceal in a paper bag and drink in the car. He entered her bedroom through the window on one occasion, which prompted his parents to install security shutters. Charlotte frequently requested that the shutters be closed, even during the daytime.

In December 2001, father cornered Brigitte in her laundry room, raging at her, making biting motions toward her nose, and screaming that she was trying to take his child away. In July 2002, he struck Cornelis with a car, severely fracturing his leg. Father was enraged because Cornelis had refused to let him take Charlotte on an outing. Brigitte witnessed the incident, and saw father looking directly at Cornelis as he struck him. Brigitte and Cornelis obtained a protective order requiring father to stay away from them.

Following this incident, father had some counseling sessions with Ellen Yates, a psychologist who had consulted with the family since the time of the Nevada custody dispute. During the course of the counseling, father became increasingly agitated, volatile, and hostile toward his parents. Although they had assisted their 41-year-old son financially throughout his adulthood, and

were caring for his daughter full time, he displayed no gratitude. He was preoccupied by their disagreements over Charlotte's activities and the idea that they were trying to take her away from him. He became accusatory toward Dr. Yates as well. She was concerned for her safety and eventually ended the sessions due to father's intransigence and volatility.

Father was granted supervised visitation with Charlotte early in 2003. In April 2003, he sought custody in the domestic violence proceeding initiated by his parents. The court found that California was now Charlotte's home state, and assumed jurisdiction over any modifications to the Nevada guardianship order. It ordered that Brigitte and Cornelis retain sole custody.

Father's supervised visits with his daughter did not go well. Charlotte felt unsafe with him and wanted the visitation monitor to remain nearby. When the monitor was not near, father would whisper to her about taking her away, to Alaska or Spain or on a skiing trip, which frightened her. Against the monitor's instructions, he repeatedly told Charlotte she would be coming to live with him, spoke to the child about the legal proceedings, and disparaged his parents. He argued with his parents at the visitation site. In March 2004, visitation was discontinued. The monitor reported: "It is necessary to terminate visitation due to repeated violations of the behavioral guidelines by numerous verbal and written warnings [*sic*]. These violations include derogatory comments about the custodial guardians, arguing with the custodial guardians on the visitation premises, personal references about the monitor, probing and harassing questions to Charlotte, statements that frighten her, use of foul language to the monitor and calling the monitor while intoxicated. These disruptive behaviors do not allow [Charlotte] an emotionally or psychologically safe place for supervised visitation to occur."

In 2004, father was convicted of a number of offenses: misdemeanor battery on a peace officer, felony obstruction of an executive officer, felony domestic violence, and theft from his girlfriend. After the felony convictions in August 2004, he was placed in a substance abuse treatment facility. In September 2004, Brigitte and Cornelis filed an adoption request. In January 2005, they petitioned to terminate the birth parents' rights under section 1516.5.

A county adoption worker filed a report with the court in March 2005. It noted that the guardians were closely bonded to Charlotte and committed to raising her. She had not seen her mother since 1995, or her father since February 2004. Charlotte was nine years old, "a very attractive, petite, personable, precocious, sensitive, articulate child." She played the violin, participated in the school band, loved to ski, and was taking tennis lessons. Her health was good. In an interview with the adoptions worker, Charlotte

described her father as "scary." She was reluctant to relate things he had done, because she worried that he would come back and do something bad to her. She wanted her grandparents to adopt her "because they will take better care of me."

Father was incarcerated, and the adoption worker spoke to him by telephone. He claimed to have a fantastic relationship with Charlotte, and to have always provided for her. He said he thought Brigitte had driven his "wife" to "suicide," though the worker was aware that Brigitte had recently spoken with mother. He blamed his drinking problem on his separation from Charlotte.

The report concluded that Charlotte's best interest would be served by terminating the parental rights of both parents so that her grandparents could adopt her. Based on statements from Charlotte and Dr. Yates, the adoption worker believed that contact with father would not be in Charlotte's best interest, and could be detrimental.

In April 2005, the court terminated mother's parental rights. She had not appeared, after efforts to locate her failed and notice was served by publication. The next month, a trial was held on the section 1516.5 petition. Father was present, represented by counsel. Dr. Yates, Brigitte, and the visitation monitor testified for the guardians. Father testified on his own behalf, and presented testimony from his brother and his pastor.

Father's counsel argued briefly that the investigation of the guardians' home was inadequate. However, his principal argument was that section 1516.5 unconstitutionally permits the termination of parental rights based solely on the best interest of the child. The court noted that the facts would not have supported a finding of abandonment under Family Code section 7822, but declined to hold section 1516.5 unconstitutional. It terminated father's parental rights, finding by clear and convincing evidence that it would be in Charlotte's best interest to be adopted by her guardians.

The Court of Appeal reversed and remanded for a determination of father's parental rights under *Kelsey S., supra*, 1 Cal.4th 816. If he could carry the burden of proving a full commitment to his parental responsibilities, the trial court was directed to deny the section 1516.5 petition, without prejudice to the assertion of other grounds for terminating father's parental rights. The Court of Appeal noted that under *Kelsey S.*, the rights of a natural father who demonstrates sufficient parental responsibility may not be terminated without a showing of his unfitness as a parent, which is required as a matter of due process. (1 Cal.4th at p. 849.) However, the court rejected the claim that section 1516.5 is facially unconstitutional, reasoning that it did not violate the

rights of unwed fathers who fail to qualify for protection under *Kelsey S.* Because the trial court did not consider whether father had made a full commitment to his parental responsibilities, the Court of Appeal remanded for further proceedings.

## II.  DISCUSSION

■  As we explained in *Ann S., supra,* 45 Cal.4th at pp. 1126–1136, section 1516.5 is facially constitutional. The statute applies only when a child has spent at least two years in a probate guardian's custody.[2] During that time all parental rights and custodial responsibilities are suspended, with the possible exception of visitation. Thus, the due process requirement of a showing of parental unfitness, which protects a parent's interest in child custody, is not necessarily applicable at the time of a section 1516.5 hearing. As a general proposition, parental rights may be terminated based on the child's best interest under section 1516.5, subdivision (a)(3), but parents may challenge the constitutionality of the statute as applied to them. (*Ann S., supra,* 45 Cal.4th at p. 1132.)

In this case, the Court of Appeal decided that *Kelsey S.* barred the termination of father's parental rights without a finding of his unfitness, if he could show his commitment to parental responsibility. The court misconstrued *Kelsey S.* Father is in no position to avail himself of the protections extended by that decision.

■  In *Kelsey S.,* we were concerned with the unequal treatment of natural fathers under the adoption statutes, as compared with mothers and presumed fathers. (*Kelsey S., supra,* 1 Cal.4th at pp. 823–825.) We noted that "[t]he child's best interest is the sole criterion" for terminating the parental rights of a natural father. (*Id.* at p. 824.) On the other hand, "a mother or a presumed

---

[2] Section 1516.5 provides in relevant part:

"(a) A proceeding to have a child declared free from the custody and control of one or both parents may be brought in the guardianship proceeding pursuant to Part 4 (commencing with Section 7800) of Division 12 of the Family Code, if all of the following requirements are satisfied:

"(1) One or both parents do not have the legal custody of the child.

"(2) The child has been in the physical custody of the guardian for a period of not less than two years.

"(3) The court finds that the child would benefit from being adopted by his or her guardian. In making this determination, the court shall consider all factors relating to the best interest of the child, including, but not limited to, the nature and extent of the relationship between all of the following:

"(A) The child and the birth parent.

"(B) The child and the guardian, including family members of the guardian.

"(C) The child and any siblings or half-siblings."

father must consent to an adoption absent a showing by clear and convincing evidence of that parent's unfitness." (*Id.* at p. 825.) And a mother could prevent a natural father from receiving the child into his home, depriving him of the status of presumed father. (*Ibid.*) We concluded that when a natural father "has sufficiently and timely demonstrated a full commitment to his parental responsibilities," this statutory scheme violated the equal protection and due process clauses of the federal constitution to the extent it permitted "a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest." (*Id.* at p. 849.)

██ Here, mother did not prevent father from receiving Charlotte into his home. He lived with Charlotte and mother in Las Vegas, and with Charlotte and his parents in Ventura County, holding out the child as his own. Therefore, he was qualified to assert his rights as a presumed father. (Fam. Code, § 7611, subd. (d); see *Kelsey S., supra,* 1 Cal.4th at p. 825, discussing Fam. Code, former § 7004, subd. (a)(4).) Furthermore, unlike the statutes under review in *Kelsey S.,* section 1516.5 does not prescribe a different standard for terminating the rights of natural fathers than it does for mothers or presumed fathers. (See *Kelsey S.,* at pp. 824–825.) For these reasons, the *Kelsey S.* holding does not apply in this case.

It is, however, conceivable that a parent faced with the termination of his or her rights under section 1516.5 would be in a position to assert a due process claim based on a showing analogous to the one we outlined in *Kelsey S.* Due process requires " 'some showing of unfitness' " before a custodial parent's rights are terminated. (*Quilloin v. Walcott* (1978) 434 U.S. 246, 255 [54 L.Ed.2d 511, 98 S.Ct. 549]; see *Ann S., supra,* 45 Cal.4th at p. 1130.) In *Kelsey S.,* we extended that protection to the natural father who lacks custody but "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise." (*Kelsey S., supra,* 1 Cal.4th at p. 849.) "In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.*)

It seems unlikely that a court would find it in a child's best interest under section 1516.5 to terminate the rights of a fully committed, responsible, and capable parent who finds an extended probate guardianship unavoidable under exigent circumstances. Nevertheless, factors similar to those set out in

*Kelsey S.* for evaluating commitment to parental responsibility might support a parent's claim that the best interest of the child standard is unconstitutional as applied to him or her.

■ This is not such a case. Indeed, father has not asserted that his parental performance entitles him to special consideration under the due process clause, either in the trial court, the Court of Appeal, or this court. The undisputed facts in the record show that he fell far short of the level of parental commitment contemplated in *Kelsey S.* Father manifestly failed to fulfill his parental responsibilities and did not promptly defend his custodial rights. To the contrary, he abandoned his responsibilities and formally waived his parental rights when the guardianship was established. Although he was living with Charlotte in his parents' home, and was evidently employed, he yielded custody to his parents as guardians and further agreed to give up his statutory parental preference in any future custody proceeding.[3] These facts alone would preclude father from establishing a full commitment to parental responsibility.

Father's subsequent conduct only confirmed his irresponsibility as a parent. He failed to make child support payments, behaved inappropriately and even cruelly to Charlotte and to both of his parents, abused his visitation rights, and persistently engaged in criminal behavior. Accordingly, the Court of Appeal erred not only by deeming *Kelsey S.* applicable in this case, but also

---

[3] The Nevada court ordered father to pay child support "based upon [his] current employment." At the section 1516.5 hearing, father testified that although he "might have been between a couple jobs here and there" when living with his parents, he was a machinist and earned between $40,000 and $80,000 a year.

The stipulated order establishing the guardianship includes the following provision: "The parties acknowledge that under NRS [Nevada Revised Statutes] 125.500, third parties must demonstrate that the care of a parent is detrimental to a child in order to gain custody of that child over the desires [of] a parent for the custody of the child. Ronald [the father] and Linda [the mother] hereby forever waive any right to apply the standard set forth in NRS 125.500 to the care and custody of Charlotte by the Plaintiffs [the guardians]. All parties acknowledge and agree that in all present and future custody proceeding[s] in this or any other forum in which Ronald and or Linda seek to gain custody or visitation of Charlotte while Charlotte is in the care of plaintiffs, the sole consideration of the court shall be the best interests of the minor child, and Plaintiffs will not be required to demonstrate that visitation with Ronald or Linda would be detrimental to the child, as set forth in NRS 125.500. Further, Ronald and Linda hereby waive any preference or right to custody of Charlotte based upon their status as parents of Charlotte."

The Nevada statute granting parents preference in custody determinations is similar to Family Code section 3041, subdivision (a). "Before the court makes an order awarding custody to any person other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interest of the child." (Nev. Rev. Stat. § 125.500.)

by remanding for further proceedings when father's inability to demonstrate a commitment to parental responsibility was thoroughly demonstrated at the section 1516.5 hearing.

## III.   DISPOSITION

We reverse the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.