Filed 8/4/25  In re A.S. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re A.S., a Minor. | C102296 |
| R.W., | (Super. Ct. No. CVSA220006724) |
| Petitioner and Respondent, | |
| v. | |
| J.B., | |
| Objector and Appellant. | |

J.B. (mother) appeals from an order terminating parental rights to her son A.S., pursuant to Probate Code[1] section 1516.5.  Section 1516.5 authorizes the termination of parental rights for children in probate guardianships when the guardianship has continued for at least two years and the court finds adoption by the guardian would be in the child's best interest.  A probate guardianship is a private custody arrangement, approved but not supervised by the court.  It is distinct from a guardianship ordered in juvenile dependency proceedings.  (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1118, 1122 (*Ann S.*).)  In a

---

[1]    Further statutory references are to the Probate Code unless otherwise indicated.

1

termination proceeding under section 1516.5, a showing of parental unfitness is not constitutionally required. (*Ann S.*, at p. 1118.)

Mother contends section 1516.5 is nonetheless unconstitutional as applied in this case because she made a full commitment to her parental responsibilities—emotional, financial, and otherwise. Mother also contends she was "deprived of her right to cross-examine" the court's investigator and that the probate court failed to comply with the requirements of section 1516.5 by delegating its duty to appoint a qualified investigator and admitting a report prepared by an investigator with unknown qualifications.

We will affirm the judgment.

BACKGROUND

The minor child A.S. was born in February 2017 to mother and father. After he was born, A.S. lived in his paternal grandmother R.W.'s (petitioner) home with mother and father for about a week. In August 2017, father and mother's relationship ended, and mother obtained a restraining order protecting her and A.S. from father. For a period of several months after August 2017, mother also prohibited petitioner from seeing A.S.

In December 2017, mother began bringing A.S. to petitioner weekly to babysit. Initially, it would be for a few hours at a time but eventually A.S. was staying overnight with petitioner. During this time, mother did not have a home of her own but was " 'couch surfing' while waiting to get public benefits and housing assistance." Sometimes she stayed with petitioner and sometimes with her own family.

In early July 2018, mother asked petitioner to babysit A.S. for a weekend so that mother could visit her boyfriend out of town; she would return on Sunday. A.S. was sick when mother left him with petitioner. On Sunday, mother did not return. Mother called petitioner and said she would be gone a few more days. Petitioner pushed back. She told mother that A.S. was still sick and she needed to come get him. Mother insisted she was entitled to a break and wanted to spend more time with her boyfriend. Petitioner threatened to keep A.S. "for good," so mother came back on Monday. The following day, petitioner began guardianship proceedings in probate court.

*Guardianship Proceedings*

In her petition for guardianship, petitioner alleged that neither mother nor father was able to properly care for A.S. Mother was abusing drugs and alcohol, and father was working 12-hour days without appropriate childcare. Petitioner was granted temporary guardianship of A.S. on July 10, 2018. Father consented to the guardianship and waived notice. Mother denied the allegations in the petition and opposed guardianship.

On August 20, 2018, the probate court heard the guardianship petition. Mother did not see A.S. until after this hearing. The court vacated the temporary guardianship orders, appointed minor counsel, and continued the matter for a contested hearing. The court also ordered petitioner to return A.S. to mother. Petitioner complied with the court's order, but, hours later, mother contacted petitioner and asked her to take A.S. back "until she got back on her feet." Mother later told petitioner she needed to get A.S. away from her live-in boyfriend who was violent and threatened to kill mother and A.S. Petitioner agreed to take A.S. but to avoid legal trouble, she had mother sign paperwork giving petitioner "legal rights" to A.S. until mother "could become stable."

The next hearing was on September 10, 2018. Mother did not appear. Petitioner advised the probate court that mother returned A.S. to her custody after the prior hearing and he remained in petitioner's custody. The court reinstated the temporary guardianship orders and continued the matter. Mother appeared at the next hearing on October 1, 2018, and agreed to the guardianship.

After obtaining guardianship of A.S., petitioner pursued a diagnosis of A.S.'s apparent disabilities. After he was diagnosed with, among other things, low-functioning autism, nonverbal learning disorder, global development delay, attention deficit disorder, and inhibited reactive attachment disorder, petitioner pursued services for A.S. She took A.S. to a doctor for referral to the Far Northern Regional Center and she met with Shasta Head Start.

On July 2, 2019, mother filed a petition to terminate the guardianship. Before ruling on the petition, the probate court issued a formal visitation schedule for mother and

A.S.: Wednesdays and Fridays from 4:00 p.m. to 6:00 p.m. The court heard mother's petition on September 24, 2019.

At the hearing on mother's petition to terminate the guardianship, the probate court noted that mother was "doing better, but due to the special needs of the minor requiring a lot of attention and stability, the petition was denied without prejudice." The court ordered mother to submit to drug testing, at petitioner's discretion. The court also ordered mother to complete a list of services before guardianship could be terminated. Those services included a drug and alcohol assessment, 16 consecutive sessions of parenting classes, and a mental health assessment. The court directed mother to comply with any services recommended in the mental health assessment. The court encouraged petitioner to "view" mother's home and increase mother's visitation if petitioner deemed it appropriate.

On August 5, 2021, mother petitioned the probate court for supervised visitation; she claimed petitioner had stopped allowing her to visit A.S. At the hearing on October 25, 2021, petitioner agreed to professional supervised visitation.

Mother filed a second petition to terminate guardianship on November 3, 2021. She argued that she completed the required assessments and classes and had been drug free for "nearly two years." Before hearing this petition, however, the probate court heard mother's petition for visitation and, on December 20, 2021, the court ordered mother to have in-person supervised visits one hour each week, video calls every night at bedtime and on Tuesdays and Thursdays after school, and one hour of nonprofessional supervised visits each week to be arranged by minor's counsel.

In addition, the probate court ordered mother to attend A.S.'s medical and educational appointments, and for A.S.'s developmental therapy visits to continue. The court directed petitioner to continue working on the applied behavior analysis (ABA) therapy with A.S., and to ensure mother was able to attend sessions with A.S. The hearing on mother's petition to terminate guardianship was set for a future date.

On March 29, 2022, petitioner filed a petition to adopt A.S. On May 20, 2022, the trial on mother's second petition to terminate guardianship began. On July 28, 2022, the

4

intended second day of trial, the parties agreed to continue the trial to August 12, 2022, because mother now had counsel. In the interim, the parties agreed mother's visitation would expand to include an additional visit at a public park, to be supervised by the agreed-upon neutral parties.

The trial proceeded on August 12, 2022, with a third day scheduled for October 7, 2022. The probate court noted that mother's petition to terminate guardianship would now trail the petition to adopt A.S.

On September 26, 2022, petitioner filed a petition to terminate parental rights and free A.S. for adoption. Petitioner alleged that she is A.S.'s paternal grandmother and guardian pursuant to an October 1, 2018, order of guardianship. She further alleged that father abandoned A.S. and mother has court-ordered, supervised visitation. Moreover, petitioner "raised [A.S.] for the last 5 years. [She] provides support for [A.S.] and treats him as though he is her biological child. She holds [A.S.] out in the community to be her child."

*Trial to Terminate Parental Rights and Free A.S. For Adoption*[2]

The trial to terminate mother's and father's parental rights and free A.S. for adoption began on March 21, 2023. The parties estimated the trial would take eight hours to complete. Ultimately, the trial would take five days and, due to scheduling difficulties, would not be completed for approximately 21 months.

*A.*     *Petitioner's Evidence*

At trial, petitioner testified that between October 2018 and November 2020, she and mother generally worked together to keep mother involved in A.S.'s life. They would meet in public for visits, but petitioner also invited mother to her home weekly to be with A.S. Petitioner allowed mother to take A.S. to visit mother's family. It was apparent to petitioner that A.S. recognized mother and their interactions were generally positive.

---

[2]     These facts are primarily taken from the probate court's statement of decision, which no party has challenged on appeal.

5

Mother participated in therapy with A.S. and attended some of his medical and school appointments, though she did not always show up when she said she would.

In 2019, petitioner discovered mother was smoking marijuana with petitioner's adult children. Then, in November 2020, petitioner found mother sitting in her parked car about to smoke marijuana; A.S. was in the backseat and it was 35 degrees outside. Mother agreed to step out of the car to smoke; petitioner demanded A.S. be brought inside the house where it was warm. Mother and petitioner argued until petitioner called the police; mother left before the police arrived. Following that incident, mother was not allowed to visit A.S. until May 2021.

In October 2021, at mother's request, the probate court ordered mother to have supervised visits with A.S. Mother waited more than three months to schedule her first supervised visit. In late 2021, mother completed the services ordered by the probate court in 2019.

In 2022, mother was invited to attend daily ABA therapy sessions in petitioner's home. Mother "appeared eager to participate and learn." About two months into their sessions, at the end of a session, mother went into A.S.'s room where he was napping and woke him to tell him goodbye. When petitioner could not get A.S. back to sleep, she argued with mother about disrupting A.S.'s schedule. Mother yelled at petitioner and petitioner told mother to leave. Mother left but continued to yell and scream on her way out. Petitioner stopped mother from participating in the sessions.

Petitioner testified that A.S. would need lifelong, full-time care. His needs are "extremely specialized" and "even small mistakes in his care can developmentally set him back months." He requires constant supervision to avoid running away or hurting himself. In addition to his medical appointments, A.S. is in school Monday through Friday. He has therapy for an hour after school on Monday, ABA and speech therapy during the week, and occupational therapy six times a month. This schedule means petitioner can no longer work outside the home.

Petitioner did not believe mother was equipped to handle A.S. She had concerns because mother was known to make intentional changes to A.S.'s care and would not listen to the caregivers and service providers. Petitioner described an incident where mother unilaterally changed the settings on A.S.'s communication device, "which caused regression in his development."

Petitioner's respite care provider also described how much oversight A.S. required. If left unattended for even a short period of time, A.S. could fall or hurt himself because he is "clumsy." A.S. would "play" in his own feces if his diaper were not changed frequently. She also reported that A.S. had "meltdowns," which she described as throwing objects, throwing himself to the ground, and hitting himself. These episodes were described by several other witnesses as well; they each explained the episodes were usually the result of A.S. being overstimulated.

Since taking custody of A.S. in July 2018, petitioner had altered her life to accommodate him. She no longer worked outside the home, and she knew a romantic relationship was unlikely. Petitioner installed baby gates, alarms, and locks throughout her home to keep A.S. safe. She asked a foster child to be removed from her home because the foster child was creating disorder, which is untenable with A.S. in the home; she became an advocate for A.S.

One of A.S.'s service providers described petitioner as an " 'inspiration to parents,' and someone who 'fiercely' advocates" for A.S. The provider said that A.S. lives "in his own world." She worked with petitioner to "focus on regulating [A.S.]'s sensory system before learning new tasks, to help with his development." She explained that A.S. required "adequate sleep" and a routine.

A.S.'s pediatrician described petitioner's advocacy, saying she was able to secure a "special needs stroller, car seat and bed, all which provide additional restraints for [A.S.]'s safety." The pediatrician confirmed that A.S. would require life-long care. In addition, A.S.'s attachment disorder made it difficult for him to bond with or adjust to new people

7

and, because of his severe autism, A.S. needed routine and structure; disruption in his life would cause "general regression."

Petitioner's adult son R.D. testified about an incident at a local restaurant in 2020. According to R.D., mother repeatedly tried to kiss A.S. who became upset and struck her "in the chest area." Mother then used her hand to " 'smack' " A.S. in the face. Petitioner took A.S. from the restaurant and told mother if she ever put her hands on A.S. again, petitioner would ensure mother never saw him again. R.D. remembered that mother did not see A.S. for about a month after that; petitioner did not trust her.

Another witness testified that in 2017, mother left A.S. "unattended in a vehicle while she briefly entered a bar to have a drink." Petitioner's adult daughter T.D. testified that mother used LSD with her while mother was supposed to be watching A.S. T.D. also testified that mother would purchase and smoke marijuana with T.D. when T.D. was 11 years old. This activity continued well into the guardianship after T.D. became an adult. Prior to the guardianship, T.D. remembered watching A.S. at mother's home while mother "went out to bars all night."

B.    *Mother's Evidence*

During her testimony, mother addressed the relationship that she was in at the time the guardianship began. She said the man she was then living with was controlling and abusive; he would listen in on her phone calls and would not allow her to leave the house without him. When he threatened her life, mother called petitioner to come get A.S. Mother said she did not agree to the guardianship but "went along with the judge" who said it was in A.S.'s best interest. Mother also believed the guardianship meant she and petitioner would raise A.S. together.

Mother testified that in 2019, she saw A.S. nearly every day. She drove him around and participated in feeding, bathing, and dressing him. But, whenever petitioner would get upset with her, she would prevent mother from visiting. According to mother, when she and petitioner argued in 2020 about the way mother spoke to petitioner's foster child, petitioner prevented mother from visiting A.S. for two or three months.

8

Regular visits with A.S. resumed in the summer of 2020, but the fights between mother and petitioner continued. Mother offered her own explanation of what happened in the 2020 restaurant incident previously described by R.D. According to mother, A.S. repeatedly stood up in his highchair; she pulled on his legs to get him to sit down. Petitioner then took A.S. to the bathroom and said the visit was over. Mother denied slapping A.S.

Mother also testified that in 2020, petitioner began cutting short mother's video calls with A.S., saying the calls were getting A.S. overstimulated. Petitioner also told mother she would allow mother to see A.S. only if the visits were supervised; so, mother petitioned the probate court for supervised visits. Mother acknowledged it took her several months to schedule the first supervised visit, but it was only because "she was busy working."

In February and March 2022, mother regularly drove from Sacramento to participate in supervised visits with A.S. and in ABA therapy. Her participation in ABA therapy ended in March 2022 when she saw A.S. "poke his head out of the room" after petitioner laid him down for a nap and she tried to give him a kiss and tell him to go back to sleep. Petitioner accused her of waking A.S. up; she called mother "a distraction" to A.S. and the two began to argue. Mother admitted to yelling and cussing at petitioner in front of A.S. She nevertheless continued to attend ABA therapy until the probate court's "order removed [m]other from therapy in April."

Mother also testified that, since filing the petition to terminate her parental rights, petitioner has canceled some of mother's supervised visits. Mother attempted to visit A.S. on his birthday but instead had a video call with him on his birthday. Mother also was upset that petitioner reached out to her when petitioner and A.S. were near Sacramento. Petitioner tried to arrange a "meet up" for mother and A.S., but petitioner said mother's new boyfriend could not attend. "Mother did not feel safe going alone," so the visit did not occur.

Mother testified that she understands A.S.'s diagnoses and denies having seen him have a "meltdown" in her presence. She has, however, seen him get upset when she leaves him. Mother expressed her frustration with petitioner and being limited to supervised visits with A.S. She believes A.S. is bonded with her and her family. At the time of her testimony, mother was working and saving money. She was living in a condominium with her fiancé; she was three years clean and 18 months sober. When asked why it took her until 2021 to complete the requirements for terminating guardianship, mother said it was because she had been "working a lot."

Mother's aunt testified on mother's behalf, as did mother's fiancé, her own mother, and a friend. According to their testimony, mother was clean and sober. Mother loves A.S. and was doing her best to be in his life.

C.    *The Probate Court's Decision*

The probate court issued a 19-page decision on the petition to terminate parental rights on August 21, 2024. A judgment declaring A.S. free from parental control and custody of mother and father issued several days later. That same day, mother's counsel requested a statement of decision. The court reissued its 19-page decision as the statement of decision, only adding a "reference to the applicable standard of burden of proof by clear and convincing evidence, to assure the parties that such burden was applied." Mother then moved the probate court to "set aside judgment for failure to prepare/enter statement of decision; failure to provide notice of filing of judgment." (Capitalization omitted.)

On October 8, 2024, mother filed her objections to the statement of decision filed by the probate court. On October 24, 2024, the court issued a 21-page final statement of decision on the petition to declare A.S. free from parental custody and control and judgment. In its final statement of decision, the court identified the relevant procedural history, the relevant legal authority, and the evidence it considered.

The court found it was "undisputed that neither parent has legal custody of [A.S.], and that the child had been in the physical custody of [p]etitioner . . . as guardian for at least two years before the petition to free was filed." The only "contested issue is the best

10

interests of the child." After considering the evidence, the court found "by clear and convincing evidence, that [A.S.] would benefit from being freed from the custody and control of his birth parents, and it would be in his best interests to terminate [m]other['s] and [f]ather's parental rights and be adopted by [petitioner]."

The probate court also considered the constitutional implications of section 1516.5 and found section 1516.5 is "facially constitutional," but subject to "as applied" challenges. Relying on our Supreme Court's decision in *In re Charlotte D.* (2009) 45 Cal.4th 1140 (*Charlotte D.*), the court determined that if a parent could show they " 'sufficiently and timely demonstrated a full commitment to [their] parental responsibilities' " but were "unilaterally precluded" from establishing their parental status, the court may be required to find that parent unfit before terminating their parental rights.

After considering the evidence, the probate court concluded that mother "was not a fully committed, responsible[,] or capable parent at the time the guardianship was commenced, or in the immediate years after." The court noted that mother returned A.S. to petitioner almost immediately after the temporary guardianship was terminated and she agreed to the guardianship proceedings. The court also noted that mother "used illegal drugs, prioritized her time with friends and her boyfriend over [A.S.], and often placed him in the care of others."

Moreover, mother "did not come forward to embrace the whole of her parental responsibilities with any urgency. When given direction by the guardianship court in September 2019 as to steps necessary to seek future termination of the guardianship, mother took over two years to complete the last of the requirements." The court did "not dispute that [m]other has improved herself and her level of responsibility significantly in the last three years . . . ." But, those improvements did not begin until more than two years after the guardianship petition was filed.

The court ruled: "The court does not believe the *Charlotte D.* court intended for a constitutional claim to section 1516.5 to be applicable, and thus require an added showing

11

of parental unfitness, when a parent delays in fulfilling parental obligations for years while a guardianship is pending, rather than promptly."

DISCUSSION

A. *Section 1516.5*

Mother argues it was a violation of her constitutional right to due process to terminate her parental rights without a showing that she was unfit to parent A.S. She contends that, while section 1516.5 is constitutional on its face, she has demonstrated a full commitment to parental responsibility and is entitled to heightened constitutional protections under *Charlotte D.*, *supra*, 45 Cal.4th at page 1140. We disagree.

1. *Applicable Law and Standard of Review*

A probate guardianship is a private custody arrangement, approved but not supervised by the court; it is distinct from a guardianship ordered in juvenile dependency proceedings. (*Ann S.*, *supra*, 45 Cal.4th at p. 1133.) Probate guardianships provide an alternative placement for children who cannot safely remain with their parents. (*Id.* at p. 1122.) "It is the family members and the guardians who determine, with court approval, whether a guardianship is established, and thereafter whether parent and child will be reunited, or the guardianship continued, or an adoption sought under section 1516.5." (*Ibid.*)

When the court appoints a guardian, the parent's authority ceases. (*Ann S.*, *supra*, 45 Cal.4th at p. 1123.) While the court has discretion to grant visitation, parental rights are otherwise completely suspended for the duration of the probate guardianship and the guardian assumes the care, custody, and control of the child. (*Id.* at pp. 1123-1124.) "Unless ended by court order, the guardianship continues until the child [either] 'attains majority or dies.'" (*Id.* at p. 1124.) "The court may terminate the guardianship on a petition by the guardian, a parent, or the child, based on the child's best interest." (*Ibid.*)

Here, paternal grandmother petitioned to terminate parental rights pursuant to section 1516.5, which allows a child in a probate guardianship to be declared free from parental custody and control if (1) the parents do not have legal custody of the child;

12

(2) the child has been in the guardian's physical custody for at least two years; and (3) the court finds that the child would benefit from being adopted by the guardian. (§ 1516.5, subd. (a).)

" 'Benefit' in this context means that adoption would be the best alternative for the child," and it "requires a determination of the child's best interest." (*Ann S.*, *supra*, 45 Cal.4th at p. 1128, fn. 10.) In making this determination, the court considers all factors relating to the child's best interest, including, but not limited to, the nature and extent of the child's relationship with the birth parents, the guardian and the guardian's family, and any siblings or half siblings. (§ 1516.5, subd. (a).) Other relevant factors "include the circumstances leading to guardianship, the parent's efforts to maintain contact with the child, any exigencies that might hamper those efforts, and other evidence of commitment to parental responsibilities." (*Ann S.*, at p. 1132.) The guardian bears the burden of making the requisite showings under section 1516.5 by clear and convincing evidence. (See *Ann S.*, at p. 1127.)

"[W]hen the clear and convincing standard of proof [is] applied in the trial court, an appellate court should review the record for sufficient evidence in a manner mindful of the elevated degree of certainty required by this standard." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1000-1001.) "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Id.* at p. 1005.) We indulge in all reasonable inferences to uphold the judgment. (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1382.) "[W]e do not resolve conflicts in the evidence, pass on the credibility of witnesses . . . . [Citation.] We merely determine if there is any substantial evidence, contradicted or not, which will support the conclusion of the trier of fact." (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.)

13

Our Supreme Court has clarified that due process does not always require a finding of current parental unfitness before the termination of parental rights in a proceeding under section 1516.5. (*Ann S.*, *supra*, 45 Cal.4th at p. 1128.) It emphasized that, "due process is satisfied if unfitness is established at an earlier stage, and parental rights [are] terminated later based on the child's best interest." (*Id*. at p. 1134.) A section 1516.5 proceeding, however, does not separate the child from parental custody. "The family," the high court explained, "is dismembered not at the time of a section 1516.5 hearing, but at least two years earlier when the guardianship is established." (*Ann S.*, at p. 1133.) "It would be anomalous to require proof in every case, by clear and convincing evidence, that a mother or father who has had no custodial responsibilities for two or more years is currently an unfit parent." (*Id*. at p. 1135.) The Supreme Court, however, noted that the statute is open to constitutional challenge as applied to an individual parent. (*Id*. at p. 1132; see also *Charlotte D*., *supra*, 45 Cal.4th at pp. 1147-1149.)

In *Charlotte D*., the Supreme Court commented, "[i]t seems unlikely that a court would find it in a child's best interest under section 1516.5 to terminate the rights of a fully committed, responsible, and capable parent who finds an extended probate guardianship unavoidable under exigent circumstances. Nevertheless, factors similar to those set out in [*Adoption of*] *Kelsey S.* [(1992) 1 Cal.4th 816,] for evaluating commitment to parental responsibility might support a parent's claim that the best interest of the child standard is unconstitutional as applied to him or her." (*Charlotte D*., *supra*, 45 Cal.4th at pp. 1148-1149.) In *Kelsey S.*, the court reviewed a statutory scheme permitting the termination of an unwed father's parental rights if adoption was in the child's best interest, even though the mother prevented the father from receiving the child into his home and establishing the status of "presumed father." (*Adoption of Kelsey S.*, *supra*, 1 Cal.4th at pp. 822-825 (*Kelsey S.*); see *Ann S.*, *supra*, 45 Cal.4th at p. 1130.) The factors identified by the *Kelsey S.* court included the father's demonstration that he was willing to assume full custody of the child and not merely block adoption by others and "the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate

with his ability to do so, and prompt legal action to seek custody of the child." (*Kelsey S.*, at p. 849; see *Charlotte D.*, at p. 1148.)

Therefore, in the context of this case, we look at whether mother has "demonstrated the necessary commitment to h[er] parental responsibilities," so as to place her in a different position than the majority of parents who face termination under section 1516.5. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 850.)

2. *Analysis*

Contrary to her claim on appeal, mother has failed to demonstrate that she promptly came forward to be a fully committed, responsible parent to A.S. Like *Charlotte D.*, "[t]he undisputed facts in the record show that [mother] fell far short of the level of parental commitment contemplated in *Kelsey S*." (*Charlotte D.*, *supra*, 45 Cal.4th at p. 1149.) The Supreme Court found that Charlotte D.'s father "manifestly failed to fulfill his parental responsibilities and did not promptly defend his custodial rights," that he "abandoned his responsibilities and formally waived his parental rights when the guardianship was established," and even when employed, yielded custody to his parents as guardians. (*Ibid*.) "These facts alone would preclude father from establishing a full commitment to parental responsibility." (*Ibid*.)

A prolonged guardianship, during which all parental rights and custodial responsibilities are suspended, with the possible exception of visitation rights, is generally inconsistent with a full commitment to parental responsibilities – emotional, financial, and otherwise. (*Ann S.*, *supra*, 45 Cal.4th at pp. 1130-1132.) Here, guardianship proceedings began when A.S. was only 17 months old. They were initiated because mother repeatedly demonstrated she was not capable of parenting A.S. She had no place to live, was using illegal drugs, and relied on others to take care of A.S. while she prioritized time with her friends and her boyfriend. And, while she initially opposed it, ultimately, she agreed to guardianship.

There is no dispute that both before and after guardianship mother spent time with A.S. and made some effort to be in his life. Her efforts to develop a meaningful

15

relationship with A.S. and make a full commitment to her parental responsibilities, however, were inconsistent and often lacking. Early in the guardianship proceedings, when the court ordered A.S. returned to mother, she immediately gave him back to petitioner. She would go weeks, sometimes months without seeing A.S. because she was too busy working. Mother's visits with A.S. were often cut short or stopped entirely because even years into the guardianship, she did not act appropriately around A.S.

Significantly, more than two years into the guardianship, mother was about to smoke marijuana in her car with A.S. sitting in the backseat. Petitioner stopped her, but mother's solution was to leave A.S. in the car and smoke outside. As late as November 2020, mother was still smoking marijuana. Not only does this conduct demonstrate a lack of care for A.S.'s well-being, but it occurred more than one year after the court ordered her to submit to drug testing. This behavior does not demonstrate a prompt and full commitment to parenting A.S.

Additionally, in 2021, mother petitioned the probate court for supervised visits with A.S. The court granted her petition, but mother waited three months to schedule her first visit. This is not the act of a person who is making a "sustained effort . . . to fulfill her parental duties," as she now claims. And, while it is true that mother visited A.S. in a therapeutic setting, simply being in those settings with A.S. does not prove a full commitment to her parenting responsibilities. To the contrary, the record demonstrates mother did not act appropriately during those visits, so much so that the court ultimately stopped her from participating.

Twice mother attempted to terminate the guardianship proceedings. In some circumstances, those attempts might demonstrate a commitment to parenting; but not here. Mother waited an entire year after guardianship began before filing her first petition to terminate guardianship. During that year she made only sporadic and cursory attempts to parent A.S. When the court denied her petition and directed her to complete a specific list of services, mother waited more than two years to finish those services. This does not approach the requirement in *Kelsey S.* that a parent come "promptly" forward and

16

demonstrate a full commitment to parental responsibilities. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)

Perhaps most importantly, A.S. is a unique child. His need for stability, routine, and patience exceeds those of typical children. When guardianship began, A.S. was already 17 months old and it was petitioner who took him to the doctor to diagnose his disabilities. Mother did not. It was petitioner who fought for A.S. to get services and equipment to meet his specialized needs. Mother did not. And it was petitioner who listened to the experts and the caregivers and learned how to support A.S.; mother ignored them and did things her own way. Mother did not use her time with A.S. to build a positive and enduring relationship with him.

To succeed on her claim, mother also must prove that an extended probate guardianship was unavoidable under exigent circumstances. (*Charlotte D.*, *supra*, 45 Cal.4th at pp. 1148-1149.) She did not even attempt to make that claim on appeal. Further, had she made that claim, it would not succeed. This is not a situation like *Kelsey S.*, where a child was withheld from their natural parent, preventing them from receiving the child into their home and establishing presumed parent status. (*Ann S.*, *supra*, 45 Cal.4th at p. 1130.) Nor is this a situation like the one contemplated by the Supreme Court in *Ann S.* where a "single mother in the National Guard [is] called to duty overseas and, and unable to reclaim custody for two years." (*Id.* at p. 1132.)

Mother has had every opportunity to fully commit herself to parenting A.S. She had custody of him for the first 17 months of his life. When she signed away custody to petitioner, petitioner and the probate court made significant efforts to include mother in A.S.'s life and bring her along in his development. It was mother who decided time and again not to make A.S. her priority. Now, after years of guardianship, A.S. has "a fully developed interest in a stable, continuing, and permanent placement with a fully committed caregiver." (*Ann S.*, *supra*, 45 Cal.4th at p. 1136.) And petitioner, "after fulfilling a parental role for an extended period, has … developed substantial interests that the law recognizes." (*Ibid*.) This is not a case imagined by the Supreme Court in *Ann S.*, *supra*,

17

45 Cal.4th at page 1110 or *Charlotte D.*, *supra*, 45 Cal.4th at page 1140, where a fully responsible parent might find it necessary to place a child in probate guardianship and, despite maintaining a parental commitment as full as the circumstances permit, eventually face a termination proceeding under section 1516.5. (*Charlotte D.*, *supra*, 45 Cal.4th at p. 1143; *Ann S.*, *supra*, 45 Cal.4th at p. 1132.)

In sum, the evidence does not support, much less compel, mother's claim that the best interest of the child standard in section 1516.5 was unconstitutional as applied to her. (See *Charlotte D.*, *supra*, 45 Cal.4th at pp. 1148-1149.)

*B.  Challenge to the Face of Petition to Free A.S. for Adoption*

Mother contends the petition to free A.S. for adoption failed to state a cause of action, a claim akin to a demurrer. We disagree. Mother did not demur to the petition in the probate court; however, "an objection that the pleading does not state facts sufficient to constitute a cause of action" may be raised for the first time on appeal. (Code Civ. Proc., § 430.80, subd. (a); *Walton v. City of Red Bluff* (1991) 2 Cal.App.4th 117, 130.) Even so, mother's claim fails.

In the civil context, a complaint, with certain exceptions, need only contain a "statement of the facts constituting the cause of action, in ordinary and concise language" (Code Civ. Proc., § 425.10, subd. (a)(1)) and will be upheld " 'so long as [it] gives notice of the issues sufficient to enable preparation of a defense' " (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 549-550). The same rule applies here. (See *Estate of Wooden* (1880) 56 Cal. 322, 325 [a petition in probate proceedings is akin to a complaint or other pleadings in a civil action].)

The petition to terminate parental rights and free A.S. for adoption was brought pursuant to section 1516.5. A cause of action in probate under this provision requires proof that "[o]ne or both parents do not have legal custody of the child[,] [¶] [t]he child has been in the physical custody of the guardian for a period of not less than two years," and "[t]he child would benefit from being adopted by his or her guardian." (§ 1516.5.)

18

In reviewing a complaint's legal sufficiency, a court will treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of law. (*Esparza v. Kaweah Delta Dist. Hospital* (2016) 3 Cal.App.5th 547, 552.) It is well settled that a "demurrer lies only for defects appearing on the face of the complaint." (*Stevens v. Superior Court* (1999) 75 Cal.App.4th 594, 601.) "We not only treat the demurrer as admitting all material facts properly pleaded, but also 'give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38.) For purposes of ruling on a demurrer, the complaint must be construed liberally by drawing reasonable inferences from the facts pleaded. (*Wilner v. Sunset Life Ins. Co.* (2000) 78 Cal.App.4th 952, 958.)

Mother claims petitioner failed to state a cause of action in her petition to free A.S. for adoption because she did not allege that A.S. was in petitioner's physical custody for at least two years. Mother ignores the reasonable inferences to be drawn from the facts pleaded in the petition.

Petitioner filed her petition to free A.S. for adoption on September 26, 2022. Petitioner alleged that she had been A.S.'s guardian since October 1, 2018, father abandoned A.S., and mother had only supervised visitation. Petitioner also alleged that she had been raising A.S. for five years and holding him out as her own child. It is reasonable to infer from these alleged facts that petitioner had physical custody of A.S. for more than two years before filing the petition to free A.S. for adoption. As a result, mother's demurrer on appeal fails.

## C. Investigator's Report

Mother contends she was denied due process because she was "deprived of her right to cross-examine" the court's investigator. She also contends the trial court failed to comply with the requirements of section 1516.5 by considering a report prepared by an investigator whose qualifications were unknown. Further, she argues the trial court failed to comply with the requirements of section 1516.5 by not actually appointing the

investigator and delegating the selection of the investigator to a third party, Quest Investigations (Quest).

These claims fail as well.

1. *Additional Background*

On October 18, 2022, minor's counsel advised the probate court that petitioner had been contacted by an investigator. Counsel wanted to "clarify" that the investigation was "in fact ordered by the Court." The court explained: "Typically when things are filed[,] the court investigator is notified[,] and that starts the process."

Minor's counsel pursued the issue further: "Can we verify for my own mental well-being it was something through Quest . . . ?

"THE COURT: Yes, they typically do these types of reports."

The investigator completed her report on November 23, 2022; she filed it on November 30, 2022 (November 2022 report). In her report the investigator included detailed statements from petitioner, mother, and three "other interested parties." The investigator concluded A.S. was a minor child who lived with petitioner. Guardianship was established in 2018. Petitioner was seeking to free A.S. for adoption and the child had not been in the custody of either parent for more than two years. The investigator recommended terminating parental rights.

The first day of trial on the petition to free A.S. for adoption was March 21, 2023. The next three days of trial took place on June 7 and 8, 2023, and September 12, 2023. On February 28, 2024, mother filed a trial brief "relating to a recently discovered issue."

In her trial brief, mother argued the investigator's report should be stricken because the investigator who prepared the report no longer worked for Quest and Quest could not provide mother's counsel with contact information for a subpoena. As a result, mother could not subpoena the investigator for cross-examination on her qualifications, her conclusions, or her recommendation. Mother noted the investigator's qualifications were not included in the report, the report included numerous hearsay statements, and she was

20

concerned the investigator did not conduct a sufficiently thorough investigation before making her recommendation to the court.

Day six of the court trial took place on March 7, 2024. After a morning break, mother's counsel told the probate court he tried to subpoena the court's investigator, but she no longer worked for Quest. Counsel argued the "investigator's conclusions and finding of facts" should be stricken from the report because he could not "cross-examine the investigator on her opinions, conclusions, and qualifications." Counsel asked that "only those provisions associated with lay witnesses be considered by the Court . . . ."

Minor's counsel advised the court that the investigator left Quest only a week prior: "[s]he could have been subpoenaed prior to last week. She could have been put on notice and been present regardless of her employment status with Quest and could have testified to what [led] her to those conclusions." Mother's concerns, she argued, would not have been an issue had counsel timely issued a subpoena. The delay seemed to be "gamesmanship," which she found "unfair to these proceedings and to ultimately [A.S.] who deserves permanency and to move speedier than it has or if we have to continue it further."

The probate court denied mother's motion. The court explained that mother's counsel "indicated the purpose of cross-examining the court investigator would be to determine her qualifications and why she rendered her opinion. So[,] this isn't an issue that would be new[,] that has recently arisen. This is an issue that would have existed at the time that we started this trial[,] which was almost a year ago. So[,] for that reason[,] I don't find that there's been due diligence in that the prejudice to [mother] would have been a prejudice created by [mother] or at least contributed to by [her]."

2. *Applicable Legal Principles*

Section 1516.5 provides in relevant part that "[t]he court shall appoint a court investigator or other qualified professional to investigate all factors enumerated in subdivision (a). The findings of the investigator or professional regarding those issues

shall be included in the written report required pursuant to Section 7851 of the Family Code."

Family Code section 7851 provides in relevant part that "[t]he juvenile probation officer, qualified court investigator, licensed clinical social worker, licensed marriage and family therapist, licensed professional clinical counselor, or the county department shall render to the court a written report of the investigation with a recommendation of the proper disposition to be made in the proceeding in the best interest of the child.  [¶] . . . [¶] The court shall receive the report in evidence and shall read and consider its contents in rendering the court's judgment."  (Fam. Code, § 7851, subds. (a) & (d).)

3.  *Analysis*

Mother claims she was denied due process because she was "deprived of her right" to cross-examine the investigator who prepared the November 2022 report.  We disagree.

Parties are entitled to an opportunity to cross-examine court appointed experts whose reports inform the court's decision.  (*Wheeler v. Wheeler* (1973) 34 Cal.App.3d 239, 242.)  However, "[d]ue diligence requires application be made to the court invoking its aid to secure such witnesses long before trial and certainly at a time which would not require an extended interruption of a trial, then almost completed.  A [party] may not complain of the absence of a witness unless [they] made a showing of due diligence to obtain the attendance of the witness."  (*People v. Du Bose* (1970) 10 Cal.App.3d 544, 549.)

Here, the investigator's report was prepared more than a year before trial began. The court was statutorily required to read and consider the report.  Mother had ample notice and opportunity to subpoena the investigator.  She nevertheless waited more than a year after trial started to issue a subpoena.  Such a lack of diligence in securing the witness did not result in a deprivation of her due process rights.

Mother also claims the probate court failed to comply with the requirements of section 1516.5 by delegating its authority to appoint an investigator to a third party and relying on a report prepared by an investigator with unknown qualifications.  Mother cites no authority to support a claim that the court appointed investigator's qualifications must

be included in the report in order to satisfy section 1516.5.  Even if such information were required, even a report that does not comply with section 1516.5 must still be considered by the court.  (*In re Noreen G.*, *supra*, 181 Cal.App.4th at p. 1380.)  Further, any questions about the investigator's qualifications could easily have been answered had mother acted with due diligence in securing the investigator's testimony for trial.

Finally, any claim that the trial court improperly delegated its authority to appoint a court investigator was forfeited because mother did not raise this objection in the probate court.  (See, e.g., *In re E.A*. (2012) 209 Cal.App.4th 787, 791 [father forfeited argument regarding visitation order by failing to effectively object during dispositional hearing].)

DISPOSITION

The judgment is affirmed.

_____

Wiseman, J.[*]

We concur:

_____

Mauro, Acting P. J.

_____

Krause, J.

_____

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23